**UNITED STATES v. PENDERGAST.**
**SAME v. O'MALLEY.**
Nos. 14567, 14459.

District Court, W. D. Missouri, W. D.
Aug. 19, 1939.

Maurice M. Milligan, U. S. Atty., and Sam C. Blair, Randall Wilson, Thomas Costolow and Richard K. Phelps, Asst. U. S. Attys., all of Kansas City, Mo., for U. S.

John G. Madden and R. R. Brewster, both of Kansas City, Mo., for Thomas J. Pendergast.

I. J. Ringolsky, William G. Boatright and Harry L. Jacobs, all of Kansas City, Mo., for Robert Emmet O'Malley.

OTIS, District Judge.

This memorandum has been written and filed for the express purpose of submitting it for publication in the Federal Supplement to the end that there may be in the literature of the legal profession some record of two cases which attracted great national interest and which presented problems difficult of solution. What made the solution of the problems involved the more difficult was the fact that even as they were presented one could hear, figuratively speaking, the imprecations upon defendants of an outraged and injured populace.

The two defendants had been indicted for attempted evasions of income taxes due the United States for the years 1935 and 1936 in violation of Section 145(b), Title 26, U.S.C., 26 U.S.C.A. § 145(b). They entered pleas of guilty. Herein are set out something of the history of the cases, what was said in open court when sentences were imposed, the sentences themselves, and some discussion of legal questions incidentally presented.

### Thomas J. Pendergast

Thomas J. Pendergast, one of the defendants, was a private citizen living in Kansas City, Missouri, who had exercised a dominating influence in city, county and state politics for a quarter of a century. Sometimes he was described as a "Political Boss" and sometimes as a "Party Leader", which title was used depending in part on the user's political affiliations and in part on whether the Boss-Leader's power at the moment was at high or low tide. His throne room was a small monastic-like cubicle on the second floor of a two-story building, well removed from the business centre of the city. "1908 Main Street" was synonymous with power, it was the local Mecca of the faithful. To this Mecca came he who would be governor, he who would be senator, he who would be judge, and he who was content to be only a keeper of the pound. Thither came alike great and little, craving audience and favors. They "beat a pathway" to the Boss's door, as Emerson said men would beat a pathway to the door of him who could make a better mouse trap than his neighbors (only Pendergast dealt not in mouse traps, but in ready mixed concrete, designed especially for county and city edifices and streets). Each who came, it is said, awaited, hat in hand, his turn, humbly presented his petition, listened to the mandate of Caesar, and backed away from the Presence. And those who did not actually go in person to bend the pregnant hinges of the knee, even the mightiest, telephoned respectful inquiries, as they passed through the city, asking concerning "Tom's health." The Leader's portrait adorned the walls of eminent public servants both in the capital of the commonwealth and at Washington, along with that of the Father of His Country and that of the Sage of Monticello, between

these other portraits, on a somewhat higher level.

Pendergast was Political Boss and Party Leader. He had no real rival, he brooked no genuine competition. It was believed that the tentacles of his octopus-like power reached into every nook and cranny of the city and into almost every enterprise, legitimate and illegitimate, good and evil. Over and over again for a score of years it was whispered that he must be particeps criminis in a hundred different offenses against the laws of state and nation. It was whispered, but never proved. It was never even charged in formal fashion by any prosecutor or by any grand jury, state or federal, that he was guilty of any specific crime (not even in the days before he inherited the sceptre). And there have been prosecutors in Kansas City who were not beholden to Tom Pendergast, able men, brave men, unshackled men. There have been grand juries in Kansas City that were not Boss controlled and which have demonstrated—and that within this very year—that they did not fear to indict any man, if there was evidence to support the indictment. But Pendergast was never even charged with a crime.

### Vote Fraud Cases

In 1936 began in Kansas City the now celebrated vote fraud investigations and prosecutions, inspired by the research into facts and into law of patriotic private citizens (whose invaluable contribution to good government has gone all unsung), presented, in the first instance, to a federal grand jury by a daring, able, fearless judge (Albert L. Reeves), and carried on with unflagging zeal and superb ability by a prosecutor who scarcely has a peer (Maurice Milligan). Scores of two-by-four criminals who had robbed citizens of the priceless right to vote were sent to jails and penitentiaries. Yet everyone connected with the prosecutions and with the court felt that the "higher-ups" were escaping deserved punishment. Four federal grand juries in succession, made up of impartial, intelligent, patriotic citizens, were charged by the judges, with all the vigor the judges could command, presenting every theory the judges could conceive, to trace the vote crime infamy to its source, and to indict whomsoever competent evidence indicated was the generalissimo of the army of fraud. And the grand juries, led on by the United States Attorney and aided by the F. B. I., the finest body of investigators any free country ever has known, went out on their campaigns, one, two, three, four, campaigns, and came back again. Fine work they did. But chained to the chariot walked never the one personage they had thought to find and capture. There just was no evidence and the federal grand juries would not indict a man against whom they could find no evidence. They would not even charge a man with a crime because of his unsavory reputation and the dark background of his life. They did not seem to be able to forget the great oath they had taken, that they would "present no one for envy, hatred, or malice, but all things truly, according to the best of their understanding."

### Then the Insurance Compromise

There had been instituted in this court on May 28, 1930, before three judges, by a large number of fire insurance companies, separate but similar proceedings in equity to restrain the enforcement of an order made by the Superintendent of the Insurance Department of Missouri fixing fire insurance rates. The contention of the companies was that the rates fixed by the order were confiscatory, that they infringed the constitutional rights of the companies. The companies filed with the Superintendent what they deemed were reasonable rates. The Three-Judge Court temporarily enjoined the enforcement of the Superintendent's order, permitted the companies to collect the higher rates, but required them to deposit the difference between the rates fixed by the order and the rates charged with the court, to await final judgment as to whether the rates fixed by the order were or were not invalid. If the rates finally were held confiscatory, then the companies would get the whole of the amount deposited. If the rates were held not confiscatory, the whole of the amount would be returned to policyholders.

The litigation was involved and difficult. The Three-Judge Court appointed a special master to take testimony, a lawyer of outstanding ability and unquestionable integrity (Paul V. Barnett). He did take testimony, filling thousands of pages. After a painstaking and scholarly analysis of the huge mass of evidence, he made his report to the court, setting out his findings and conclusions. On the whole, they were favorable to the companies. If they were approved by the court, probably the com-

panies would get all they had deposited, the policyholders not a cent. The final stage in the litigation was to be the argument to the court of exceptions to the special master's report and of the case on the merits. But before the day of argument arrived the Three-Judge Court was advised by counsel for the parties that the litigation had been compromised. By the terms of the settlement twenty per centum of the impounded fund was to be distributed to the policyholders and eighty per centum to the companies and for expenses. A decree carrying out the settlement accordingly was entered and the court's custodian began the huge task of distributing several million dollars to a host of policyholders.

Long afterward the United States Attorney for the Western District of Missouri learned of seemingly insignificant and unrelated facts which led him to suspect that the insurance compromise was brought about, at least that it was influenced, by the use of money paid by an agent of the companies to Thomas J. Pendergast. He set out upon a dogged pursuit of what at first was a mere phantom. Again and again he encountered what seemed obstacles that could not be surmounted. But he held on relentlessly to his idea and to his course. When the real nature of his purpose began to be understood powerful individuals did what they could to obstruct him. But others, more powerful, who deserve great credit, came to his assistance,—the Governor of Missouri, the Secretary of the Treasury, the Attorney General, perhaps even the Chief Magistrate. (Not to be too late, reinforcements came by air plane at the last.[1]) And always the United States Attorney had the aid of the fine and resourceful lawyers of his immediate staff[2], and the determined backing of an intelligent and courageous grand jury. (Not one of the grand jurors as yet has claimed exclusive credit for law enforcement in this state.)

Finally the long persistence of the United States Attorney was rewarded with the successful transmutation of rumor and suspicion and flat denials into a little of the pure gold of truth, ready to be laid before the grand jury. It was the will and force of one man that brought recalcitrant witnesses to a realization of their duty and made indictments possible. And it was chiefly the testimony of a single person— which always he could lawfully have refused to give—that provided for the indictments a solid foundation. Whether prosecutions would have been successful depended also largely on that witness. Success hung by a slender thread. Even a month's delay might well have jeopardized the prosecutor's hopes.

Pendergast and O'Malley were indicted for attempting to evade the payment of income taxes. The Government's one witness to essential facts had testified before the grand jury that Pendergast had turned over to O'Malley, who was the Superintendent of the Insurance Department when the settlement and compromise were made, a part of the amount which the agent of the companies had paid Pendergast. O'Malley's record, like that of Pendergast, was not blotted with a single conviction or a single charge of crime. Neither Pendergast nor O'Malley had included the amounts they had received in their income tax returns. Shortly following their arraignment, they announced through their counsel that they would enter pleas of guilty. Undoubtedly they hoped for that consideration which for centuries judges have shown to those who have confessed their guilt and thrown themselves upon the mercy of the court. Counsel asked only that they be allowed to make full statements and counsel for Pendergast asked that they be permitted to submit medical testimony touching the grave physical maladies from which the defendant was suffering. On May 22, 1939, after hearing testimony that Pendergast, then near his 67th birthday, was and that for several years he had been grievously afflicted, he was sentenced. The sentence was preceded by the following discussion of applicable principles, written, and read from the bench.

---

[1] So in the morning of the world came the goddess through the air to the house of Odysseus to aid the hero Telemachus. "She spoke and bound beneath her feet her lovely golden sandals, that wax not old, and bare her alike over the wet sea and over the limitless land, swift as the breath of the wind. And she seized her doughty spear, shod with sharp bronze, weighty and huge and strong. * * * Then from the heights of Olympus she came glancing down."

[2] The lawyers on the staff of the United States Attorney at the time referred to should be mentioned by name. They were Randall Wilson, Sam Blair, Tom Costolow, Richard Phelps and Otto Schmid.

## The Applicable Principles

"The defendant, Thomas J. Pendergast, has entered pleas of guilty to the two counts of this indictment. Counsel for the United States and counsel for the defendant have stated the facts which they believe should be considered in determining what sentences will be imposed. It is my duty now to pronounce sentence. I preface the discharge of that duty with a brief statement of principles and standards, which, when applied to the facts presented and judicially noticed, determine what the judgment must be. For the judgment of a court of justice, if it is a court of justice, always is determined by principles and standards, never by the caprice of the judge—by principles and standards which are the same for all, and which, save as they slowly develop through long periods of time, are the same yesterday, today and tomorrow.

"1. When a defendant has been charged with a given crime and has entered a plea of guilty to that charge, the punishment assessed should be for the crime charged, and that only. If the crime charged is, as here, attempted tax evasion, the punishment should be for attempted tax evasion. Not a jot or tittle should be added to the punishment because it is judicially noticed that the defendant has been a political 'boss', nor because it is judicially noticed that the city and county which he has dominated have been governed with indescribable corruption and dishonesty. There are those, I know, who think such matters should affect the sentence imposed for attempted tax evasion. They who think so err.

"2. Congress has said that the most extreme punishment for attempted tax evasion shall be five years' imprisonment and a fine of $10,000 for each offense. Here is a standard created by Congress for the guidance of the judges. Congress has said that in that case of attempted evasion in which the circumstances reach the maximum of possible aggravation, the punishment shall be five years' imprisonment and a fine of $10,000. The aggravating circumstances conceivable in an attempted tax evasion case are: (a) that the defendant intended to cheat the government of a large, not a trifling, amount; (b) that the defendant has been a persistent tax evader; (c) that the defendant, in a case in which guilt finally is proved, has put the government to enormous expense to prove his guilt, and perhaps has added perjury to the offense charged against him. Only the first of these aggravating circumstances is present in this case.

"3. Consideration always should be given to an accused person, who, being guilty of a crime, enters a plea of guilty. By that action he makes possible the saving of great labor to the department of justice and of great expense to the public treasury. What is far more significant, the exemplary value of certain and immediate punishment, for example, by imprisonment for a relatively short period, is immeasurably greater than the exemplary value of a possible, but uncertain, five years imprisonment, which may begin eighteen months hence, and which may never begin at all. Here is a consideration which this defendant deserves in unusual degree.

"4. Consideration always must be given to the ill health of one who is to be sentenced, if that ill health is of so serious a nature as that imprisonment for a long period certainly would endanger life. It is not that a sick man is entitled to special leniency. If he was well enough to violate the law, he is well enough to pay the penalty. Certainly, moreover, it is most inaccurate to intimate that if a judge sentences a sick man to imprisonment he may have sentenced him to death. If it should be the decree of the Great Judge of the Universe that death should come to one imprisoned, the responsibility for his situation is not upon the judge who imposed the sentence, but upon him who knowingly committed the offense, knowing it was punishable by imprisonment.

"The true reason for considering ill-health is that the quantum of punishment is not determined by the single factor of length of imprisonment. The effect of imprisonment is another factor. The effect on a sick man may be double the effect on a well and strong man. This defendant is physically afflicted. Some consideration must be given to that fact.

"5. Above all other principles to be considered now is this principle: The law of the land is supreme in the land; before the majesty of the law all men stand equal.

"In determining what should be the sentence and judgment in this case, I have given careful consideration to each one of these principles and standards."

## Sentence and Judgment

When the applicable principles had been stated the sentence and judgment was imposed as follows:

### Count I

"It is the sentence and judgment of the court, upon the plea of guilty to count I of the indictment, that the defendant, Thomas J. Pendergast, be committed to the custody of the attorney general, to be confined in a federal penitentiary during a period of one year and three months.

"It is the intention of the court that this sentence shall be served, except as hereafter it may lawfully be modified either by the federal board of paroles or by the chief magistrate. The sentence will not be modified by the court.

"The service of this sentence will begin immediately upon the conclusion of the pronouncement of sentence as to count II, unless the attorney general shall otherwise direct.[3]

### Count II

"It is the sentence and judgment of the court, upon the plea of guilty to Count II of the indictment, that the defendant, Thomas J. Pendergast, shall pay a fine of $10,000 and that he shall be committed to the custody of the attorney general to be confined in a federal penitentiary during a period of three years.

"Service of this sentence is suspended and the defendant is placed on probation for a period of five years, which period of probation shall begin on the day when the defendant is released from actual institutional custody under the sentence imposed in connection with Count I.

"The conditions of this probation, in addition to the usual conditions[4] are these:

"1. The defendant will pay the fine imposed.

"2. During the period of probation the defendant will obey all laws, national, state and municipal, to which he may be subject.

"3. The defendant will promptly pay to the United States of America the full amount, with legal penalties, of all income taxes which have been or may be assessed against him for the two years referred to in this indictment, unless, before the period of probation begins, he already has paid such amounts; provided, however, that it will not be considered to be a violation of this condition if the defendant pays less than the full amounts assessed, through any concession or waiver made by the taxing authorities of the United States; and, provided, further, that probation will not be revoked for failure to comply with this condition if it shall be proved to the court that the defendant is not financially able to comply with the condition and that he was not financially able to pay the taxes due on the date the indictment in this case was returned.

---

[3] Immediately after the imposition of the sentence it was modified by a grant of a stay of one week. Actual imprisonment began on May 29. O'Malley's imprisonment began on the same day.

[4] The usual conditions of probation in the Western District of Missouri, furnished in printed form to every probationer when the period of his probation begins, are that he shall: (a) Refrain from the violation of any state and federal penal laws; (b) live a clean, honest and temperate life; (c) keep good company and good hours; (d) keep away from all undesirable places; (e) work regularly; (f) that he shall not leave or remain away from the city of his residence without permission of the Probation Officer; (g) that he shall contribute regularly to the support of those for whose support he is legally responsible; (h) that he shall follow the Probation Officers' instructions and advice; (i) that he shall report promptly on days to be fixed.

Under these conditions and the practice in this district Pendergast will be required to appear in person once each month for five years at the office of the Probation Officers, with other probationers. He will be required to await his turn, and to report orally and in writing concerning his every activity during the month,—with whom he has associated, whether he has strictly obeyed the general and special conditions of his probation, whether he has led a clean, honest and temperate life. Once each month a Probation Officer will call on Pendergast either at his home or place of business. Pendergast must receive him courteously and promptly and truthfully answer every question asked. He will not be permitted to leave the city except for the best of reasons and he must always ask permission. He will not be permitted to bet on the races or gamble in any form. He will not be permitted, directly or indirectly, to take part in any sort of political activity unless his full civil rights shall be restored by Presidential pardon. He will not be permitted to visit 1908 Main Street during his probation.

"4. During the period of probation the defendant will report to the probation officers of this court in such manner, concerning such matters, and at such times as, under the supervision of the court, they shall direct."

### Criticism of Pendergast Sentence

Pendergast was sentenced on Monday, May 22, 1939. Five days later, Saturday, May 27th, O'Malley entered pleas of guilty and was sentenced. In the interim there was both widespread approval by eminent jurists, lawyers and editors of the Pendergast sentence and also the most violent criticism. The criticism certainly was sincere, but hasty, unanalytical, spoken and written apparently in complete blindness to the particular crimes for which sentences had been imposed and to the solemn obligations of the judicial oath. Much of the criticism entirely ignored substantial parts of the sentences. All the criticism altogether overlooked the civil fine or penalty exceeding $175,000 imposed by law on Pendergast. The theory of the men (not one of them ever had been charged with the responsibility of imposing a sentence in a criminal case) who cried out against the judge with much more vigor than ever they had cried out against the "Boss", was that Pendergast should have been punished because he had been "Boss," because he had been suspected of various offenses against the state and city, because as one put it, "of the background." The judge, it was said, had "let the community down," as if the offense for which punishment was imposed was an offense against "the community." Pendergast should have been required to pay not only for the crimes with which he was charged, but also for all his sins and all the sins of all his followers.

Ac, veluti magno in populo cum saepe
        coorta est
Seditio, saevitque animis ignobile vulgus;
Jamque faces et saxa volant; furor arma
        ministrat.

These facts explain the remarks of the court, written, and read from the bench preceding the sentencing of O'Malley, as follows:

### Why the Pendergast Sentence Was Just

"I must consider now anew the sentence which was imposed by me on Thomas J. Pendergast, to know to what extent it should guide me as a precedent in the case of Emmet O'Malley, who has pleaded guilty to a similar offense. Due consideration for the criticism that the Pendergast sentence has received from good men requires its re-examination.

"1. When I imposed that sentence I knew that it was exactly in line with sentences I had imposed in criminal cases in which there were pleas of guilty during the fourteen years I have served as a Federal Judge. If it was out of line in any way whatever, it was out of line on the side of severity, not leniency.

"There has been some public reference to the sentences imposed by me in the vote fraud cases, where there were pleas of guilty or nolo contendere. I have reviewed the sentences in these cases. Eighteen vote fraud cases fell to me. There were in those cases 16 pleas of guilty. There was 1 sentence of a year and a day in the penitentiary, 11 jail sentences ranging from one month to seven months, and 4 probations.[5] Eighty-one entered pleas of nolo contendere. Not one of them was required to serve a day in jail. These were offenses for which the maximum possible imprisonment was ten years, just twice that authorized for attempted tax evasion.

"There has been some public reference to the sentences I have imposed in Dyer Act cases. There the maximum punishment possible is five years' imprisonment. I have sentenced scores, perhaps hundreds, of these offenders. When there is a plea of guilty and no record of criminal convictions, my sentence almost invariably has been imprisonment for one and one-half years or less.

"The sentences I have imposed in connection with every other type of crime might be studied. It would then be found that the Pendergast sentence was in line with all other sentences where there were pleas of guilty and no records of previous criminal convictions.

"2. I have reason to believe that the Pendergast sentence was one of the heaviest that ever has been imposed in the United States in a case charging an at-

---

[5] This summary does not include those defendants in the vote fraud cases who did not plead guilty, but were convicted. As to them, penitentiary and jail sentences were imposed (the maximum terms were three and four years).

tempt to evade an income tax in which there was a plea of guilty.[6]

"3. Some who have criticized the Pendergast sentence have not carefully studied it. The first part of the sentence was imprisonment in the penitentiary for one year and three months. The second part of the sentence was a fine of $10,000, above and beyond all civil penalties.[7] The third part of the sentence was three years' imprisonment in the penitentiary (additional to the one year and three months), with probation for five years.

"The thinking man will know that while a penitentiary sentence, no part of which is to be served unless probation is revoked, is little more than a stern warning, a suspended penitentiary sentence of three years, with probation for five years, following a penitentiary sentence of a year and three months which actually must be served in a felon's cell, is much more than twice a sentence of one year and three months, all to be served. Why is that true? Because the first year (indeed the first week) in the penitentiary more than offsets any succeeding two years or five years. It is in the first year, the first week, the first day after the iron gates have clanged shut, that the badge of 'Convict' is fastened upon the prisoner.[8] When the prisoner steps out of actual confinement and begins to serve, during five additional years, a suspended penitentiary sentence, he is still a 'Convict'. Pendergast was sentenced to wear the badge of 'Convict' for one year and three months behind penitentiary walls, in the seclusion of a prison, and then to wear it for five years longer before the eyes of his fellow men.

"And there are those who really think

---

[6] The statement that the Pendergast sentence was one of the heaviest ever imposed in a similar case received dramatic confirmation in a telegram received just before O'Malley was sentenced and immediately read in open court. The telegram was from the Department of Justice and was signed by Honorable James W. Morris, Assistant Attorney General, in charge of the Tax Division. The telegram follows:

"Washington D C May 27 1939
"Hon. Merrill E. Otis, United States District Judge. Kansas City.

"United States Attorney Milligan has referred to me your letter requesting information regarding sentences imposed upon pleas of guilty in tax cases where no previous criminal record. Hurried examination of our files shows over period of three and a half years ending June 30, 1937, average sentence upon plea in tax cases was approximately three months and $1,500 fine, irrespective of previous record of defendant. In cases somewhat comparable to Pendergast, most severe sentences upon pleas of guilty in recent years, where there was no previous criminal record were imposed in the case of Claude M. Worley, Indianapolis chief of police, five years, $10,000 fine; Julius Zweig, printer, two years, $5,000 fine; Edward M. Smith, California businessman, eighteen months, $25,000 fine.

"In recent years sentences more severe than Pendergast case imposed upon pleas guilty in twelve or fifteen cases, but majority had criminal records.

"All things considered, Pendergast sentence quite in line with comparable cases. Have discussed Pendergast sentence with several treasury officials and all entirely satisfied with sentence and with this I agree.

"James W. Morris,
"Assistant Attorney General."

[7] The civil penalties which Pendergast must pay and which the criminal sentence enforces amount to more than $175,000, in addition to the taxes he attempted to evade.

[8] What was said from the bench in this connection proved to be peculiarly true in the case of Pendergast. On the very day the doors of the prison closed behind him his disgrace and shame were blazoned on the front pages of all the journals of the nation. Photographs of the penitentiary, artists' sketches of the fallen Boss going to his doom, were published broadcast, together with the name, "Thomas J. Pendergast." Rarely in history has any criminal been branded as a "convict" with such pitiless publicity. Within a week some of the greatest newspapers in the land published photographs of Pendergast and O'Malley, his fellow prisoner, in convict garb, announcing that that was an unprecedented privilege granted by the Attorney General. Literally millions of copies of these pictures were printed and circulated, for members of the families of the prisoners and for the whole world to see, that the world might know how a man is punished who attempts to evade a tax. Word pictures followed. One of these showed Pendergast moving stumblingly about the prison yard, shorn now of all his power, picking up scraps of paper with a pointed stick, the only prison task he had strength to do. So did the eyeless and broken Samson, chained, a prisoner, toil "in Gaza at the mill with slaves".

that such a sentence, imposed on an old and a sick man,[9] in all probability a sentence to actual punishment for the remainder of his life, was not severe enough for the crime of attempting to evade the payment of a tax, attempting to evade the payment of a debt. He should have been broken upon the wheel! At the very least he should have been sentenced to what for him necessarily would have been life imprisonment. Well, perhaps I am altogether wrong, but I do not agree with these good men.

"4. There are those who speak of the Capone case. Is it possible that an intelligent man will compare that case with the Pendergast case? Capone had a criminal record. Capone did not plead guilty. Capone fought the Government through trial court, Court of Appeals, and the Supreme Court. With all of that, his sentence was three years on each of three counts and he was required to pay one $10,000 fine. Reducing that sentence by eliminating one period of three years to make the case parallel with the case of Pendergast, in which there were only two counts, the sentence was six years plus a $10,000 fine. Pendergast plead guilty. He was not a former convict. He was an old and sick man. He has been dealt swift punishment, not punishment long delayed.

"5. At least ten days before the Pendergast plea was entered it was intimated to me and to the United States Attorney that it would be entered. For ten days I gave the most careful and painstaking thought to what principles should determine the sentence, reserving final determination of the sentence until I had heard statements in open court from both sides. I stated what those principles were at the time of sentence. I shall not repeat that statement now.

"I gave especially careful consideration to the nature of the offense charged. The attempt to evade the payment of a tax is not a crime malum in se, as is murder, rape, and theft. It is a crime malum prohibitum. Ordinarily the only penalty for the offense is a civil penalty. In 99 out of 100 cases where it is established beyond any doubt that a citizen has attempted to evade the full payment of his income tax,

the Government has accepted the tax plus the civil penalty. And that is as it should be. But the Government of the United States does not compromise for money what is truly and inherently a crime.

"Apparently there was one of the applicable principles upon which I did not sufficiently enlarge on Monday. I said then that if one is charged with attempting to evade a tax and pleads guilty to that charge he should not be punished for a score of other crimes with which he is not charged and as to which the law presumes his innocence. I thought the principle so obviously was sound that it needed no enlargement.

"Certainly it is within the discretion of the judge to make the sentence small or great in accordance with the mitigating or aggravating circumstances of the crime. But the circumstances which may affect the sentence must be circumstances connected with the crime. For example, if an attempt to evade the tax succeeds previous attempts, admitted or proved, or other previous crimes admitted or proved, that is an aggravating circumstance that should affect the punishment. Again, if the attempt to evade the tax involves substantial amounts, that is an aggravating circumstance which should affect the punishment. But it is absurd to say that the source from which a citizen receives income, however bad, or the purpose for which he receives it, however evil, is an aggravating circumstance of an attempt by him to avoid payment of an income tax. The two things have no connection whatsoever.

"These principles seem to me now as they seemed on Monday to be true and sound. Perhaps I should have ignored them in the Pendergast case alone. Perhaps I should have ignored in that one case precedents and principles and the commands of reason. Perhaps I should have yielded to passion and hatred and revenge. I am glad I did not yield.

### O'Malley

"6. O'Malley, it appears, lived honorably for more than sixty years. He was honest in his transactions with his fellow men. Then he became an important officer

---

[9] Pendergast had not been in the penitentiary a fortnight until he collapsed from the physical maladies from which the medical testimony clearly showed he was suffering when he was sentenced.

The Attorney General, advised by the prison physicians, announced from Washington that the prisoner was dangerously ill from several serious afflictions.

of the state. In that capacity he settled with insurance companies a piece of litigation involving millions of dollars. Perhaps he was bribed to make that settlement. For thirty thousand pieces of silver, it may be, he betrayed Missouri. It is likely that the tax he attempted to evade was on the bribe money he had received. But he has not been charged with the taking of a bribe. He could not be charged with that offense in this Federal Court. He has pleaded guilty to the charge of attempting to evade the tax, in amounts which are substantial. The punishment will be substantial. He has not pleaded guilty to bribe taking. The simple question is, should he be punished for the crime with which he is charged, and then punished, in the same judgment, for a crime which is not and could not be charged against him in this court, but which may and should be charged against him in another court? It is a simple question. The only answer possible is an emphatic, 'No'."

### Sentence and Judgment as to O'Malley
### Count I

"It is the sentence and judgment of the court, upon the plea of guilty to Count I of the indictment, that the defendant, Emmet O'Malley, be committed to the custody of the Attorney General, to be confined in a federal penitentiary during a period of one year and one day.

"It is the intention of the Court that this sentence shall be served, except as hereafter it may lawfully be modified either by the Federal Board of Paroles or by the Chief Magistrate. The sentence will not be modified by the court.

"The service of this sentence will begin immediately upon the conclusion of the pronouncement of sentence as to Count II unless the Attorney General shall otherwise direct."

### Count II

"It is the sentence and judgment of the court, upon the plea of guilty to Count II of the indictment, that the defendant, Emmet O'Malley, shall pay a fine of $5,000.-00 and that he shall be committed to the custody of the Attorney General, to be confined in a federal penitentiary during a period of two years.

"Service of this sentence is suspended and the defendant is placed on probation for a period of five years, which period of probation shall begin on the day when the defendant is released from actual institutional custody under the sentence imposed in connection with Count I.

"The conditions of this probation, in addition to the usual conditions, are these:

"1. The defendant shall pay the fine imposed.

"2. During the period of probation the defendant will obey all laws, national, state and municipal, to which he may be subject.

"3. The defendant will promptly pay to the United States of America the full amount, with legal penalties, of all income taxes which have been or may be assessed against him for the two years referred to in this indictment, unless, before the period of probation begins, he already has paid such amounts; Provided, however, that it will not be considered to be a violation of this condition if the defendant pays less than the full amounts assessed, through any concession or waiver made by the taxing authorities of the United States; and, Provided, Further, that probation will not be revoked for failure to comply with this condition if it shall be proved to the court that the defendant is not financially able to comply with the condition and that he was not financially able to pay the taxes due on the date the indictment in this case was returned.

"4. During the period of probation the defendant will report to the probation officers of this Court in such manner, concerning such matters, and at such times, as, under the supervision of the court, they shall direct."

### Doctrine of U. S. v. Greenhaus
### Rejected

Since the imposition of sentences in these cases attention has been called to the opinion and judgment of the Circuit Court of Appeals for the Second Circuit in United States v. Greenhaus, 85 F.2d 116, 107 A.L.R. 630, filed August 3, 1936, in which it was held that a sentence identical in form with that imposed upon both Pendergast and O'Malley was void as to the provision suspending the sentence on certain counts and granting probation as to the sentence on those counts. The application of the doctrine of that case, for example, to the case of Pendergast would produce this result: Pendergast would be compelled to serve the sentence of one year and three months in the penitentiary imposed on Count I of the indictment and then to serve the consecutive sentence on Count II of

three years in the penitentiary, a total of four years and three months. Similarly O'Malley would be required to serve a total of three years and one day. (The fines imposed, $10,000 and $5,000 are additional to the prison sentences.) It is said that some concern is felt for the defendants by reason of the Greenhaus opinion. One purpose of this memorandum is to dispel any such concern and again to make clear what was the intent when the sentences were imposed.

When the sentences were imposed United States v. Greenhaus was not overlooked, but the earlier contrary opinion of the Tenth Circuit Court of Appeals in White v. Steigleder, 37 F.2d 858, filed January 24, 1930, which approved a sentence in like form, was regarded as stating the law correctly. Frad v. Kelly, 302 U.S. 312, 58 S.Ct. 188, 82 L.Ed. 282, filed December 6, 1937, removes any real doubt that still might have been entertained as to whether the court of the Second Circuit or the court of the Tenth Circuit was right. It should be said, however, that Frad v. Kelly does not deal with precisely the same situation as does either the Greenhaus case or the Steigleder case.

The opinion in United States v. Greenhaus was written by one of the great judges of the land, Circuit Judge Augustus N. Hand, to whose opinion ordinarily any district judge would certainly defer. It is believed, however, that in this one instance he and his distinguished colleagues reached an erroneous conclusion. Outside the Second Circuit the Greenhaus case has not been followed. See, for example, Deliz v. Rexroad, D.C., 18 F.Supp. 862, 863. The theory of the Greenhaus case, that separate sentences on two counts of an indictment really are only one sentence and that therefore United States v. Murray, 275 U.S. 347, 48 S.Ct. 146, 72 L.Ed. 309 (holding that a judge cannot require the execution of one part of a sentence and grant probation as to a second part of the same sentence), governs, seems artificial and untenable.

Consider the Pendergast case. Suppose he had been sentenced to consecutive terms of imprisonment, a year and three months on Count I and a year and three months on Count II. The crimes charged certainly were separate and distinct (one was a charge of attempting to evade an income tax for one year, the other a charge of attempting to evade an income tax for another and different year). The sentences would have been separately pronounced, a separate sentence as to each count. How can it be said that the two separate sentences are one sentence made up of inseparable parts? There might have been a plea of Guilty as to Count I and a plea of Not Guilty as to Count II, changed to a plea of Guilty three months later, after service of the sentence as to Count I had been proceeding for three months. Would anyone then say that the two sentences were one sentence? The difference between the situations is that in one three seconds elapsed between the imposition of the separate sentences and in the other three months elapsed. But that is no difference. Two shots from the same gun are two shots whether separated from each other by a half-second or a half-year.

There might have been a plea of Guilty as to Count I and a plea of Not Guilty as to Count II followed by a trial and a mistrial. The sentence as to Count I might have been served before the second trial as to Count II. A verdict of Guilty might have resulted at the second trial and sentence have been imposed. Would it not then be absurd to say that the two sentences were one sentence? But the only difference between that and this situation, so far as principle is concerned, is the difference in elapsed time between the imposition of the separate sentences.

Consider now the statute granting jurisdiction to suspend sentences and grant probation, Title 18, Section 724, U.S.C. 18 U.S.C.A. § 724. The statute provides that "The courts of the United States having original jurisdiction of criminal actions * * * shall have power, after conviction or after a plea of guilty or nolo contendere for any crime or offense not punishable by death or life imprisonment, to suspend the imposition or execution of sentence and to place the defendant upon probation for such period and upon such terms and conditions as they may deem best. * * *"

No other statute modifies or takes away from this jurisdiction. Neither expressed or implied is there any such exception as this—"Provided, however, the court may not suspend the execution of a sentence for one crime or offense and grant probation if the sentence as to another crime or offense is not suspended." On the contrary the statute is clear that the power apper-

tains to the execution of the sentence for "any" crime as to which there has been a conviction or a plea of guilty. The power may be separately exercised for each separate crime, whether charged in separate indictments or (what is the same thing) in separate counts of the same indictment. One exception only is expressed in the statute. If the crime charged is one punishable by death or life imprisonment then a sentence for that crime cannot be suspended. Expressio unius exclusio alterius est. The familiar rule requires that the statute be not interpreted as excluding the power with reference to any crime merely because it has not been exercised with reference to another crime.

I think that the Circuit Court of Appeals for the Second Circuit in reality (although not expressly) receded from the position it took in the Greenhaus case when later (May 10, 1937) it handed down its decision in Kelly v. U. S. ex rel. Frad, 89 F.2d 866. There separate crimes were charged although they were connected in purpose and motive, just as separate crimes were charged in the Greenhaus case, also connected in purpose and motive. In the Frad case there were pleas of Guilty "simultaneously" to the several crimes charged and sentence was suspended and probation granted in one case. In the Greenhaus case the defendant was convicted simultaneously as to several crimes charged and sentences for certain of the crimes were suspended and probation granted. . The only distinction between the Frad and the Greenhaus case was this: In the Frad case the several crimes were charged in separate indictments and in the Greenhaus case the several crimes charged were charged in separate counts of the same indictment. That is a distinction without a difference.

When the Supreme Court affirmed the judgment in the Frad case, 302 U.S. 312, 58 S.Ct. 188, 191, 82 L.Ed. 282, it bottomed its opinion on the express language of the statute and said: "The mere fact that a sentence of a fine and imprisonment had been imposed upon one of the indictments' in no way militated against the prescription of probation in respect to the plea of guilty under the other two." The same reasoning applies to a case of several counts in one indictment as applies to a case of several indictments. The Supreme Court drew no fine distinction between separate indictments and separate counts.

## Consent to Other Prosecutions Granted

Since it has been thought desirable that this memorandum should be written there is another matter that had as well be dealt with for it certainly will arise hereafter. There is a possibility that other crimes yet may be charged against the defendants. Indeed judicial notice is taken of the fact that since O'Malley was sentenced he has been indicted by a grand jury in the City of St. Louis for the crime of accepting a bribe. Judicial notice is taken of the fact that a grand jury called by the (state) circuit court of Jackson County, Missouri, is even now conducting an investigation to determine whether the defendants should not be indicted for various crimes against the laws of the state. Judicial notice is taken of the fact that the United States Attorney for this district has been directed by a Three-Judge Federal Court to secure indictments, if the evidence available should warrant, charging all persons, if there are any, who participated in any criminal way in bringing about the compromise of the insurance cases with the crime of obstructing the administration of justice in the courts of the United States. The United States Attorney also has been directed by the same Three-Judge Court to institute contempt proceedings against any person or persons believed by him, after investigation, to be guilty of contempt of court. Judicial notice is taken of the fact that the two last mentioned matters may involve these two defendants.

If out of these various matters criminal charges against the defendants should come (in addition to the indictment already returned in St. Louis against O'Malley) of course the defendants will be entitled to and will be given trials (as O'Malley will be entitled to a trial upon the St. Louis indictment). But it has been said that even when they have served the prison sentences imposed upon them which they now are undergoing they still will be in federal custody under the suspended sentences, Pendergast for five years and O'Malley for three years, and that while they are in that custody they cannot otherwise be prosecuted. And there is high authority for that doctrine. See, for example, Grant v. Guernsey, 10 Cir., 63 F.2d 163. So far as no little research has disclosed there is no contrary authority. One who is in federal custody under a suspended sentence cannot

be prosecuted for another offense without the consent of the court which has suspended his sentence and granted probation.

But let this one thing be clear. This court never has protected and never will protect any person to whom probation has been granted from prosecution in any court of the United States or of any of the states. To do that would be quite as infamous as it would have been to punish these defendants, on charges of attempting to evade the payment of a tax, not only for the offenses charged, but also for a dozen other hinted at but unproved crimes against a different sovereign, for which they might elsewhere be charged and punished and as to which the punishment for attempted income tax evasion would have given them no protection. Even "My Lord Jeffreys" would have shrunk from so great a wrong as that.