PENDERGAST *v.* UNITED STATES.*

No. 183. Argued December 14, 15, 1942.—Decided January 4, 1943.

*Together with No. 186, *O'Malley* v. *United States,* and No. 187, *McCormack* v. *United States,* also on writs of certiorari, *post,* p. 608, to the Circuit Court of Appeals for the Eighth Circuit.

*Mr. Ralph M. Russell* argued the cause for petitioner in No. 186; *Mr. John G. Madden* argued the cause for petitioner in No. 183; and *Messrs. James E. Burke* and *James P. Aylward* were with them on the brief for petitioners in Nos. 183 and 186. *Mr. James E. Carroll* submitted for petitioner in No. 187.

*Messrs. William S. Hogsett* and *Herbert W. Wechsler* argued the cause, and *Solicitor General Fahy* and *Mr. Richard K. Phelps* were with *Mr. Hogsett* on the brief, for the United States.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioners, together with one Street, now deceased, conceived and executed a nefarious scheme in fraud of the federal District Court and in corruption of the administration of justice. The short of it was that petitioners by fraud and deceit and through misrepresentations by attorneys induced the court to issue decrees effectuating a corrupt settlement of litigation. It happened this way:

Several insurance companies doing business in Missouri filed with the Superintendent of Insurance an increase in insurance rates which the Superintendent denied. The insurance companies filed over 130 separate injunction suits against the Superintendent and the Attorney Gen-

eral in the federal court to restrain the enforcement of certain statutes of Missouri on the ground of unconstitutionality. A three-judge court was convened which granted motions for interlocutory injunctions on July 2, 1930, whereby the Superintendent and the Attorney General were enjoined, pending final decision, from enforcing the Missouri statutes—on condition, however, that the insurance companies deposit the amount of increase in rates which was collected with a custodian of the court to await the final outcome of the litigation. In September 1930 a special master was appointed, who held hearings. During this time the premiums impounded by the court accumulated, until by 1936 they amounted to almost $10,000,000.

The lure of this sizeable amount of other people's money played an important part in the scheme which was hatched.

Street was in charge of the rate litigation for the insurance companies. Pendergast was a "political boss." O'Malley was the then Superintendent of Insurance. McCormack was an insurance agent. Of these, only O'Malley was a party to the litigation. Street agreed to pay Pendergast a "fee" of $750,000 to use his influence over O'Malley and obtain a settlement of the litigation which would be satisfactory to the insurance companies. O'Malley was agreeable. McCormack was the go-between. Street made an initial payment of $100,000 in currency, which was divided $55,000 to Pendergast, $22,500 to O'Malley, and $22,500 to McCormack. Thereafter an agreement was reached and reduced to writing in form of a memorandum. O'Malley would approve as of June 1, 1930, 80% of the increase in rates which the companies had sought; the parties would appear by their attorneys and join in seeking appropriate orders for distribution of the impounded money; 20% was to go to the policyholders, 50% directly to the insurance

companies, and 30% to Street and another as trustees for the insurance companies. The latter were to account to the companies but not to the court or the superintendent. The memorandum agreement was not disclosed to the court. But on June 18, 1935, the insurance companies filed in each case a motion reciting terms of settlement and praying for an order of distribution. On the next day the insurance companies and O'Malley filed stipulations agreeing that the court should make the order of distribution. Thereafter on June 22, 1935, October 26, 1935 and January 24, 1936, hearings were held in open court on the motions, and briefs were filed. Counsel, who were wholly innocent and acting in good faith, assured the court of the honesty, fairness, and desirability of the settlement. On February 1, 1936, the court, acting in reliance on the representations and without a hearing on the merits, entered a decree ordering distribution of the impounded funds as prayed in the motions. It also dismissed the bills, reserving jurisdiction, however, for certain purposes.

Petitioners then proceeded further with their corrupt plan. About April, 1936, Street paid $330,000 in currency, of which Pendergast received $250,000, O'Malley $40,000 and McCormack $40,000. In the fall of 1936, Pendergast received another $10,000 in cash from Street. That left $310,000 of the $750,000 "fee" unpaid. And, so far as appears, it was never paid, due to the unraveling of facts which led to an exposure of the entire corrupt scheme. For about that time an internal revenue investigation of Street's income tax return disclosed that over $400,000 of the funds for which Street was to account as trustee had been paid to unknown persons. This was reported to the Court in February 1939. A grand jury investigation followed, in which the rest of the sordid story was unfolded. See *United States* v. *Pendergast,* 28 F. Supp. 601. The Department of Justice caused Pender-

gast and O'Malley to be indicted for evasion of income taxes on the amounts of money so received. They pleaded guilty and were fined and imprisoned late in May, 1939. *Id.* On May 29, 1939, O'Malley's successor filed a motion praying that the decrees of February 1, 1936, be set aside on the basis of those disclosures and that the insurance companies be ordered to restore the funds distributed to them. The court ordered the insurance companies to make restitution; and they did. At the same time, the court asked the district attorney whether contempt proceedings should be filed. About a year passed, when the court on May 20, 1940, requested the district attorney to institute contempt proceedings against petitioners. An information was filed July 13, 1940. Motions to abate and quash were overruled. 35 F. Supp. 593. Thereafter answers were filed and a hearing had. Petitioners were adjudged guilty of contempt—Pendergast and O'Malley being sentenced to two years' imprisonment and McCormack being sentenced to probation for two years. 39 F. Supp. 189. The Circuit Court of Appeals affirmed. 128 F. 2d 676. We granted the petition for certiorari because of the importance in the administration of justice of the problems raised.

Petitioners press several objections to the judgment below. The chief of these are that the offense was not a contempt under § 268 of the Judicial Code (28 U. S. C. 385) as construed by *Nye* v. *United States,* 313 U. S. 33, and that even though it was, the prosecution of it was barred by the three year statute of limitations contained in § 1044 of the Revised Statutes, 18 U. S. C. § 582. We do not reach the first of these questions and need not express an opinion on it. For although we assume *arguendo* that the Circuit Court of Appeals was correct in holding (128 F. 2d p. 683) that the conduct of petitioners was "misbehavior" in the "presence" of the court, within the meaning of § 268 of the Judicial Code, and

therefore punishable as a contempt, we are of the opinion that this prosecution was barred by § 1044 of the Revised Statutes.

That section provides: "No person shall be prosecuted, tried, or punished for any offense, not capital, . . . unless the indictment is found, or the information is instituted, within three years next after such offense shall have been committed . . ." It would seem that the statute fits this case like a glove. If the conduct in question was a contempt, there can be no doubt that it was a criminal contempt as defined by our decisions. See *Nye* v. *United States, supra,* pp. 41–43 and cases cited. As such, it was an "offense" against the United States, within the meaning of § 1044. It was held in *Gompers* v. *United States,* 233 U. S. 604, that a wilful violation of an injunction, likewise punishable as a contempt under § 268 of the Judicial Code, was such an "offense." And see *United States* v. *Goldman,* 277 U. S. 229. Cf. *Ex parte Grossman,* 267 U. S. 87. It was said in the *Gompers* case that those contempts were "infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech." 233 U. S. p. 610. That observation is equally pertinent here. Moreover, we can see no reason for treating one type of contempt under § 268 of the Judicial Code differently in this respect from others under the same section. No such difference is discernible from the language of § 1044. Because of that and because of the further circumstance that Congress classified them together in defining the offense in § 268, we can hardly conclude that a distinction between them for purposes of § 1044 should be implied. Furthermore, the fact that this prosecution was by information, the absence of which has been held not fatal under § 1044 (*Gompers* v. *United States,*

*supra,* pp. 611–612), brings the case squarely within the language of the section.

Certainly the power to punish contempts in the "presence" of the court, like the power to punish contempts for wilful violations of the court's decrees, "must have some limit in time." *Gompers* v. *United States, supra,* p. 612. It is urged, however, that there is no limitation on prosecutions for contempts in the "presence" of the court except as one may be implied from the conclusion of the proceeding in which the contempt arises. But if we are free to consider the matter as open, no reason for that different treatment of contempts in the "presence" of the court is apparent. *Adams* v. *Woods,* 2 Cranch 336, held that this statute of limitations was applicable to an action of debt for a penalty. Chief Justice Marshall stated that it would be "utterly repugnant to the genius of our laws" to allow such an action to lie "at any distance of time." *Id.,* p. 342. That observation is equally apt here. Proceedings like the rate litigation out of which this prosecution arose might well continue for years on end awaiting final disposition of all the funds. If there is a contempt, it takes place when the "misbehavior" occurs in the "presence" of the court. Statutes of limitations normally begin to run when the crime is complete. See *United States* v. *Irvine,* 98 U. S. 450. Every statute of limitations, of course, may permit a rogue to escape. Yet, as Chief Justice Marshall observed in *Adams* v. *Woods, supra,* p. 342, "not even treason can be prosecuted after a lapse of three years." That was still true at the time of this offense. See R. S. § 1043, 18 U. S. C. § 581. There is no reason why this lesser crime, punishable without some of the protective features of criminal trials, should receive favored treatment.

But it is said that the contrary conclusion is to be inferred from *Gompers* v. *United States, supra,* because this Court took pains to point out that its ruling was applicable

only to proceedings for contempt "not committed in the presence of the court." 233 U. S. p. 606. But that reservation, made out of an abundance of caution, also extended to "proceedings of this sort only" (*id.*, p. 606), *viz.* proceedings where no information was filed. *Ex parte Terry,* 128 U. S. 289, 314, sanctioned summary punishment for "direct contempts" committed in the "presence" of the court. The question whether that procedure could be followed "at a subsequent term, or at a subsequent day of the same term," was specifically reserved. *Id.*, p. 314. That is a procedural problem peculiar to direct contempts in the face of the court (see *Cooke* v. *United States,* 267 U. S. 517), and obviously has no relevancy to the problem of the statute of limitations.

The prosecution contends, however, that the offense consisted in the imposition of a fraudulent scheme upon the court, that successful execution of the scheme required not only misrepresentations to the court but continuous coöperation in concealing the scheme until its completion, that the fraud on the court would not be fully effected until 80% of the impounded funds was distributed to the insurance companies and $750,000 paid by Street and divided among petitioners. On that theory the fraudulent scheme, though commenced before the three year period, continued thereafter. Accordingly, it is argued, by analogy to such cases as *United States* v. *Kissel,* 218 U. S. 601, 607–608; *Hyde* v. *United States,* 225 U. S. 347, 367–370; *Brown* v. *Elliott,* 225 U. S. 392, 400–401, that the statute of limitations began to run only after the latest act in the execution of the scheme. It is true that the information was drawn on the theory of such a continuing offense. But the difficulty with that theory lies in the nature of the offense described by § 268 of the Judicial Code.

That section, so far as material here, limits the power "to punish contempts" to cases of "misbehavior" in the

"presence" of the court. If this was an ordinary criminal prosecution brought under § 135 of the Criminal Code (18 U. S. C. § 241) for "corruptly" obstructing "the due administration of justice," quite different considerations would govern. The fact that the acts were not in the "presence" of the court would be immaterial. And we may assume that a fraudulent scheme of the character of the present one would constitute a continuous offense under that section. We may also assume that certain "misbehavior" in the "presence" of the court might constitute an offense under § 135 of the Criminal Code as well as a contempt under § 268 of the Judicial Code, so as to give a choice between prosecution before a jury and prosecution before a judge. But the offense of "misbehavior" in the "presence" of the court does not have the sweep of "corruptly" obstructing or conspiring to obstruct "the due administration of justice." Congress restricted the class of offenses for which one may be tried without a jury. In the present case, as in prosecutions for contempt for wilful violations of injunctions (*Gompers v. United States, supra,* p. 610), each act "so far as it was a contempt, was punishable as such" and therefore "must be judged by itself." As we have said, once the "misbehavior" occurs in the "presence" of the court, the crime is complete. It is conceded that but for the misrepresentations made to the court there would have been no "misbehavior" in its "presence" within the meaning of § 268 of the Judicial Code. And it is not claimed that there were any misrepresentations made to the court within three years of the filing of the information; or if May 29, 1939, the date when the court directed the inquiry, be deemed the important one (*Gompers v. United States, supra,* p. 608), there is no contention that any such misrepresentations were made within three years of that time. It is not fraud on the court which § 268 makes punishable as a contempt, unless that fraud is "misbehavior" in the "presence" of the court

or "so near thereto as to obstruct the administration of justice." And, if the latter requirements are not met, the fact that the fraud may be "misbehavior" is not sufficient. The mere continuance of a fraudulent intent after an act of "misbehavior" in the "presence" of the court does not make that "misbehavior" a continuing offense under § 268. The misrepresentations to the court made possible, of course, the consummation of this nefarious scheme. But each subsequent step in that scheme did not constitute a contempt unless, like the misrepresentation itself, it was "misbehavior" in the "presence" of the court or "so near thereto as to obstruct the administration of justice." No such showing has been made here and none has been attempted. The fact that the scheme was fraudulent and corruptly obstructed the administration of justice does not enlarge the limited power to punish for contempt. It merely means that if petitioners can be punished, it must be through the ordinary channels of criminal prosecutions under the Criminal Code. We are forced to conclude that any contempt committed occurred not later than February 1, 1936, when the court ordered the distribution of the impounded funds. It was therefore barred by the statute of limitations.

*Reversed.*

Mr. Justice Murphy took no part in the consideration or disposition of this case.

Mr. Justice Jackson, dissenting:

I do not agree that we should leave undecided the question whether conduct of this sort constitutes punishable contempt. To use bribery and fraud on the Court to obtain its order for disbursement of nearly $10,000,000 in trust in its custody is not only contempt but contempt of a kind far more damaging to the Court's good name and more subtly obstructive of justice than throwing an ink-

well at a Judge or disturbing the peace of a courtroom. I would hold the conduct of these petitioners to be "misbehavior" and within the "presence" of the Court and hence a contempt within the meaning of the statute. I should not deflect what seems to be the course of practical and obvious justice in this case by resort to metaphysical speculations as to the effect of absence of the schemers from the courtroom when attorneys whom also they had deceived obtained the order from the Court.

Neither can I agree with the Court's conclusion that this contempt expired with the setting sun and the statute of limitation then began its work of immunizing these defendants. The fraud had as its object not merely to get the Court order, but to get the money from the Court's custody. The contempt and the fraud did not cease to operate so long as the money was being disbursed in reliance upon it, and by virtue of its concealment.

Hence, I find no good reason for interfering with the effort of the lower court to bring these men to account for their fraud on it.

MR. JUSTICE FRANKFURTER:

I wholly agree with the conclusion of MR. JUSTICE JACKSON that the petitioners' conduct constituted a contempt within the meaning of § 268 of the Judicial Code, 28 U. S. C. § 385. But I am also compelled to conclude, for the reasons stated in the opinion of the Court, that prosecution for such offense is barred by the applicable statute of limitations, R. S. § 1044, 18 U. S. C. § 582.