## Brodstein Disbarment Case.

Argued May 2, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*C. Wilson Austin,* with him *Speicher & Austin,* for appellant.

*James W. Bertolet,* with him *John S. Rhoda,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, June 13, 1962:

Ellis Brodstein, a member of the Berks County Bar for 40 years, was disbarred, after a hearing by the lower Court. Brodstein had filed three income tax returns which the lower Court found to be fraudulent. In one of these returns he had omitted to report approximately $22,000 income which he received in 1956. In imposing sentence the Court took into consideration not only the aforesaid fraudulent income tax returns but also (a) the fact that in 1930, Brodstein had been suspended for three years for unprofessional conduct, and (b) the fact that Brodstein's conduct for nearly 25 years had been so exemplary that he had been elected in 1951 President of the Berks County Bar Association, and (c) that he was highly respected by judges and lawyers alike, and (d) that he is now 66 years of age and ill, and (e) that he had paid his deficiency (income) taxes in full.

Brodstein contends that in the light of all these facts, the sentence of disbarment was unreasonable, unjust and undoubtedly too harsh, and that the Court should instead have imposed a sentence of suspension. The lower Court imposed the sentence of disbarment with great reluctance.

This Court being evenly divided on the question of whether there was an abuse of discretion, the Order of the lower Court is affirmed.

Mr. Justice BENJAMIN R. JONES and Mr. Justice EAGEN dissent and would enter an order suspending appellant from the practice of law for a period of five years.

86

CONCURRING OPINION BY MR. JUSTICE COHEN:

The apparent lack of appreciation of the lawyer's fundamental responsibility to the courts, the public and our form of government which is evidenced by the dissenting opinion compels me to make this observation in support of the majority.

Since the founding days of this nation, the lawyer has played an important part in our democratic process. It was through the lawyer and his intimate relationship with government that our country developed the unique institutions that now characterize our American society. The large number of lawyers who have been presidents, governors, congressmen and legislators, not to speak of those who served in countless other public positions, have closely identified the lawyer with our democratic government and our democratic institutions.

The relationship of the lawyer to his government should provide an exemplary standard for the relationship of the general public to its government. Actions that breach the solemn trust that the lawyer owes to his government do great damage to our democracy. They should not be glossed over, justified or excused by unwarranted emotionalism.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In 1930 when Attorney Ellis Brodstein was young at the bar he represented a man named A. Edward Hoffman who was sued by a woman named Anna Baumwald for $12,000, being commissions allegedly due her for the sale of trucks manufactured by Hoffman. In this litigation, Brodstein allowed zeal to becloud judgment and championing of his client's interests to overcome integrity, and in doing so transgressed the code of the profession. He quickly realized

his error and himself paid $12,000 to Miss Baumwald, the amount she had been claiming from his client. Because of this straying from the paths of professional rectitude, Brodstein was suspended as an attorney for three years.

At the end of the period indicated, Brodstein resumed the practice of the law, determined to so comport himself that the stain on his professional shingle would not only be completely eradicated but that his conduct might be cited as exemplary. He was eminently successful in this noteworthy endeavor. He labored long and arduously, he put his heart into his work, he plunged into religious, civic and charitable activities, he treated his brothers at the bar and his fellow-men with respect, kindliness and amiability. His friends became legion. He so earned the good will and the esteem of the bar that in 1951 he was elected President of the Berks County Bar Association.

And so the years passed. He had now reached his sixties, enjoying in the community in which he lived and practiced, "honor, love, obedience, troops of friends," when he was charged with crime. He was accused by the United States Government of having evaded the payment of income taxes for the year 1954, 1955 and 1956, in the total amount of $7,664.69.

He paid the Government the full amount claimed, and then in the United States District Court, before Judge JOHN W. LORD, he pleaded nolo contendere to the criminal charges. Judge LORD suspended sentence, placed Brodstein on probation for one year and imposed a fine of $7,500 which the defendant paid.

The Berks County Bar Association then brought disciplinary charges against him and, after hearing, recommended permanent disbarment. The Court of Common Pleas of Berks County approved the recommendation and entered an order of disbarment, which this Court, upon appeal, has affirmed.

The appellant submits that while the plea of nolo contendere may be regarded as a plea of guilty, insofar as the criminal proceedings are concerned, it is not actually equivalent to an admission of guilt and therefore may not be used against the defendant in any subsequent civil action. There is formidable authority for this position. In *Com. v. Ferguson,* 44 Pa. Superior Ct. 626, President Judge RICE said that the plea of nolo contendere "cannot be used against the defendant as an admission in any civil suit for the same act."

It can happen that a person accused of crime is actually innocent but lacks the evidence to establish that fact, in which event he might fear that to contest the prosecution and to be found guilty after an adverse proceeding could create a resentment which would provoke a greater penalty than might be his if he threw himself on the mercy of the Court. Accordingly, he could plead nolo contendere which means "I will not contest it." In *Teslovich v. Fireman's Fund Insurance Co.,* 110 Pa. Superior Ct. 245, the Court approved of the lower court's opinion which declared, inter alia: " 'So far as we have been able to ascertain, all of the authorities that have spoken of the matter (aside from Consol. Ice Mfg. Co. v. Medford, supra, cited to us by the present defendant) treat the plea of nolo contendere as being an implied admission made solely and exclusively for the purposes of the indictment, and as having no further operation or effect . . . And it has been specifically laid down that it cannot be used as evidence against the defendant in a civil suit to show that he did the act charged against him in the criminal case . . . in Guild v. Lee, 3 Bost. Law R. 433, which was an action for an assault and battery, it was held by SHAW, C. J., that the plaintiff could not give in evidence the proceedings on an indictment for the same assault, to which the defendant had pleaded nolo

contendere, the Chief Justice saying: "I have no doubt on the subject whatever. The plea was nolo contendere, and the proceedings are not competent evidence in a civil suit for the same assault. One object of this plea is to *prevent the proceedings being used in any other place.*" ' " (Emphasis supplied.)

In the case of *Com. ex rel. Dist. Atty. v. Jackson,* 248 Pa. 530, this Court held that while a plea of nolo contendere has the same effect as a plea of guilty, *so far as the indictment is concerned,* it "will not preclude a defendant in a civil suit from contesting the facts charged in the indictment."

Black's Law Dictionary states that although a plea of nolo contendere admits, "for the purposes of the case, all the facts which are well pleaded, but [it] is *not to be used as an admission elsewhere.*" (Emphasis supplied.) In the case of *In re Hallinan,* 272 P. 2d 768, the court held, in referring to proceedings involving disbarment, that "a plea of nolo contendere is not the equivalent of a plea of guilty and cannot be used in another proceeding as an admission against the person so pleading."

In the case of *Louisiana State Bar Ass'n. v. Connolly,* 20 S. 2d 168, the Louisiana State Bar Association petitioned for the disbarment of an attorney who had pleaded nolo contendere to a charge of violating the Federal income tax laws. The Supreme Court of Louisiana dismissed the petition, stating: "A plea of nolo contendere is not technically a plea of guilty, but it is one in substance if accepted by the court; for when so accepted, it becomes an implied confession of guilt. However, it has no effect beyond the particular case, and *it cannot be employed against the. defendant as an admission in any civil suit for the same act.*" (Emphasis supplied.)

I believe that the penalty imposed by the court below was cruelly out of proportion to the facts in the

case. Even if the court believed that the plea of nolo contendere was equivalent to a plea of guilty, the circumstances did not justify total and permanent disbarment which, of course, to a lawyer, so far as a career is concerned, amounts to capital punishment. To permanently disbar a lawyer means to humiliate and degrade him for life and to bring shame and discredit on himself and family. While, of course, there are many situations which not only justify but demand this ultimately drastic punishment, the record does not reveal such a situation to be present here.

In the case of *Alker Disbarment,* 398 Pa. 188, where disbarment was affirmed, we approved of what President Judge KLEIN of the Orphans' Court of Philadelphia County said, namely: "No strict technical rule has ever been adopted in this State. *Our rule is one of common sense* and each case is judged on its own circumstances. The true test in a disbarment proceeding is whether the attorney's character, as shown by his conduct, makes him unfit to practice law from the standpoint of protecting the public and the courts." (Emphasis supplied.)

It does not seem to me that the lamp of common sense illumined the proceedings which brought about the Draconian punishment inflicted in this case. Nor does it appear that the tribunal was lit up by the golden sunlight of charity when consideration was being given to the case of a lawyer 66 years of age who, aside from the offenses here indicated, has led a blameless life. In addition the Court ignored the plaintiff's physical condition. While, of course, bodily disablement is no defense to misconduct, there is scarcely a tribunal which, deliberating on a choice of punishment, does not take into consideration the state of health and the capacity to absorb punishment on the part of the person who is to receive the lash of penalization. The medical evidence presented in this case shows that Brodstein is

presently suffering from a coronary arteriosclerosis with angina pectoris, diabetes mellitus, hyper-cholesteremia, arteriosclerosis obliterans with intermittent claudication and degenerative arthritis of severe nature of the cervical spine.

There is one passage in the opinion of the court below which cannot possibly merit laudation. It reads: "Had he [Brodstein] elected to plead 'not guilty' and had a jury returned a verdict of 'not guilty,' the problem of fitness to practice law would not necessarily have been answered."

If Brodstein had elected to stand trial and had been found "Not Guilty," it would have been a travesty on the law and justice for the court below to disbar him on the charge of which the jury had found him innocent. The statement of the court below that it would not be guided by a verdict of not guilty is an attack on our judicial system, it is a denial of due process, it is an assault on the principles of fairness which control all our democratic institutions. It has happened more than once that innocent persons have been indicted and have been properly acquitted.

What I have stated so far in this Dissenting Opinion is not to be interpreted as a "softness" toward those who betray their trust as lawyers. I am merely saying that in the case before us, Brodstein has not been proved so derelict, so culpable in his conduct as to justify the terrible penalty inflicted by the court of Berks County and affirmed by this Court.

I believe that the punishment should fit the offense. Respondent's counsel in his brief points out: "neither the 1930 case, nor the instant case, involved any betrayal of clients' trust or confidence, or any misuse of funds of others; they were acts purely personal to the appellant, and although he acted in an improper manner as a young and zealous lawyer in 1930, it is urged upon your Honorable Court that the Ellis Brod-

stein of 1954-1955-1956, the years in which the tax evasion allegedly occurred, was a different person than the Ellis Brodstein of 1930."

But the court below says: "Respondent contends that in the event that disciplinary action is in order, the Court should act to suspend his right to practice and not disbar him. We would agree with such contention and impose suspension except for the fact that in 1930 the Supreme Court of Pennsylvania suspended respondent's right to practice for a period of three years. This is the second time that disciplinary action has been required."

The respondent's first dereliction occurred in 1930. Thirty-one years have passed since then. Respondent's counsel well says that the Brodstein of today is not the Brodstein of 1930. If the constantly recurring breakers of time and the ever-surging cleansing tides of the passing seasons do not wipe out what was written in the sands of thirty-one years ago, then character once injured can never be healed, a good name once blemished can never be regained, a horizon once clouded can never be blue again. According to the Court of Common Pleas of Berks County, the lawyer who stumbles once may as well continue to trip until he topples over the precipice of complete and irrevocable ruin, because no matter how much he makes amends, no matter how repentant he may be, no matter how exemplary his mode of life, he will never be treated equally with the other members of the bar. I believe that such a doctrine, such a policy is not only contrary to the law but is opposed to the teachings of every religion in the world.

I would hold that whatever Brodstein did in 1930 should not even be referred to, much less be held as a crippling factor in the adjudication of what occurred thirty years later. Brodstein paid his debt to the opposing litigant involved, he discharged his indebtedness

to society, he met his responsibility to the law, he satisfied the mortgage on his career held by the Berks County Bar Association for three years. What more does the Berks County Bar Association want? To brandish the sin of thirty years ago, like a spiked club, over the head of the ill and aging Ellis Brodstein is, in my estimation, suggestive of cruel and unusual punishment. It is like rereading pages of the misfortunes of Jean Valjean.

The question presented to the Court of Common Pleas of Berks County was not strictly a legal one. It involved rather an appraisal of the proper relationship between the collective bar and a lawyer; it involved, more so, the relationship between man and man. I do not see in the record that the court gave any moral evaluation to the truly vital factors involved. It would appear that the court was determined to degrade the respondent at all costs. After the Berks County Bar Association had prepared its report on Attorney Brodstein but before it had filed it in Court, Brodstein on June 20, 1961, submitted a letter resigning "from the Bar of the Court of Common Pleas of Berks County, effective immediately." The court refused to allow the resignation to take effect. It ordered that the bar association proceed. If the objective of the proceedings was to have Brodstein severed from the Bar, this objective was attained when Brodstein voluntarily resigned. But the court would not permit this humane ending to the career of a lawyer who at one time had so enjoyed the respect of the Bench and Bar that he was elected president of the bar association. It insisted on accomplishing the disaster of the bar association ex-president in the most painful way possible.

The court below declared that it would have preferred "to impose a period of suspension." I exercise my privilege to doubt the sincerity of this expression.

94

The court said: "As brothers in the profession, we have worked with respondent and have respected him for many years."

It could not be much of a respect which insisted on pouring obloquy from the window on to the guest after the guest had voluntarily quitted the house in which theretofore he had been welcomed and honored.

The court said further: "Counsel have cited no authority and our research has disclosed no authority that has recognized the appropriateness of suspension after a lawyer for prior misconduct has once before received such punishment from the appellate court of the State."

It is apparent that the court has not looked for the indicated precedents in the right books. The precedents will be found in the Bible, in the Golden Rule, in the Sermon on the Mount. The appropriate precedent which the Court has not been able to find through "research" shines forth in Matthew, chapter 18, where Peter asked Jesus: "Lord, how oft shall my brother sin against me, and I forgive him? till seven times?" And in verse 22, we read the reply: "Jesus saith unto him, I say not unto thee, Until seven times: but, Until seventy times seven."

It is not a question of how many times a man has offended but whether he has reformed, whether he is not fit to rejoin society, whether he has truly repented, whether he can now be depended upon to be honest in his dealings with his fellow-man.

Blameworthy as were the offenses charged against Brodstein, they were not acts of meanness, cruelty or brutality. With regard to the income tax trouble, he said in court: "I cannot say that I did it with deliberate conscious intent to evade taxes, but I certainly admit gross negligence, stupidity, and carelessness."

I can join with the Majority of this Court and with the court below in condemning Brodstein's actions, but I cannot possibly see how his actions merit the ultimate.

finality of professional decapitation, especially in view of the manner in which other cases of a similar character have been disposed of in the courts of Pennsylvania.

The court below says that it cannot find a case where an attorney who committed two offenses was suspended from the profession rather than permanently disbarred. I would say in reply to that proposition that the court below cannot find a case which says that a court is compelled to inflict the ultimate penalty of total disbarment where an attorney has twice erred. On the contrary, there are many cases where even conviction under income tax laws following trial has not dictated disbarment. We have actually had a rather large number of cases in Pennsylvania where attorneys guilty of violating the income tax laws have not been disbarred because the crime, while obviously reprehensible, is regarded malum prohibitum. (*U.S. v. Pendergast,* 28 F. Supp. 601, 609.)

The case of *In re Hallinan,* 272 P. 2d 768 although of another state is in point. Attorney Hallinan represented the notorious Communist abettor on the Pacific Coast, Harry Bridges. He was found guilty, after a jury trial, of violating the Internal Revenue Code, 26 U.S.C. §145(b) by " 'willfully and knowingly filing false and fraudulent income tax returns.' " The State Bar of California filed a certified copy of the conviction with the Supreme Court of California, and asked for Hallinan's disbarment on the basis that the conviction, ipso facto, dictated disbarment under the Business and Professions Code which provided for the summary disbarment of attorneys convicted of " 'a felony or misdemeanor, involving moral turpitude.' " The Supreme Court of California rejected the representation and held that conviction under federal statute for failure to collect and pay over tax or attempting to collect or evade tax does not necessarily involve

moral turpitude and does not justify summary disbarment. In support of its decision it said: "The crucial question in the present proceeding, therefore, is whether or not an intent to defraud the United States is an essential element of the crime proscribed by section 145 (b) of the Internal Revenue Code. If an intent to defraud is not an essential element and a person may be convicted thereunder without proof of that intent or other conduct evidencing moral turpitude, an attorney convicted of that crime cannot be summarily disbarred. Since section 145(b) is a United States statute, we must accept the interpretation given it by the United States courts. [citing cases] These courts have uniformly held that an intent to defraud is not an essential element of section 145(b) and that a conviction under that section does not necessarily involve moral turpitude." The California Supreme Court cited a case of the United States Supreme Court (*United States v. Scharton*, 285 U.S. 518) in support of its position.

The precedents establish almost conclusively that there was no compulsion on the part of the Court of Common Pleas of Berks County to permanently disbar Ellis Brodstein. The court could have accomplished equally salutary results, without permanently disabling the respondent, by suspending him from the practice of the law for a period of years or even indefinitely; but to place his head on the block because of the offenses discussed is not in keeping with the traditions of the bench and bar where mercy is not unknown and where help to a fallen brother is not to be regarded as weakness.

The Court below has referred to the case of *Schlesinger Appeal*, 404 Pa. 584. In that case the Court of Common Pleas of Allegheny County (by a unanimous vote of sixteen judges) after extended hearings, which spanned ten years, by a subcommittee of the Committee

on Offenses, disbarred Attorney Hymen Schlesinger on the ground that he had been a member of the Communist Party. This Court reversed. The Allegheny County Court of Common Pleas found that Schlesinger. had made the following statement: " 'Comrades, while we have a large Communist Party in New York, I don't see how we can wage a successful revolution in the United States unless we build the Communist Party in Pittsburgh where we have the basic industries.' "

A Majority of this Court found nothing in such a statement to warrant disbarment. The Majority Opinion said: "This statement obviously was no more than an expression of opinion or prediction of future events and cannot, by any stretch of imagination, be tortured to mean an exhortation to use force and violence for the overthrow of the government."

If an attorney may author revolutionary statements of the character quoted and still be regarded as a responsible and respected member of the Bar, I fail to see how Ellis Brodstein who, throughout his whole life, manifested unwavering loyalty to the United States, should be deprived of his good name, his reputation and his livelihood. I fail to see why, under the facts of the case, and the precedents of this very Court, Ellis Brodstein should be made to walk the last remaining miles of his life's journey over a broken road infested and overrun with the noxious fungus of ostracism and the poisonous weeds of contumely, shame and humiliation.

I repeat that such a doom represents cruel and unusual punishment which Ellis Brodstein has not earned and does not deserve.

I, therefore, vigorously dissent.