UNITED STATES of America, Appellee,

v.

Gary John EKLUND, Appellant.

No. 82–2505.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 2, 1983.

Decided May 4, 1984.

Richard C. Turner, U.S. Atty., Joseph S. Beck, Asst. U.S. Atty., S.D. Iowa, Des Moines, Iowa, Stephen L. Hiyama, Atty., Gen. Litigation and Legal Advice Section, Crim. Div., Dept. of Justice, Washington, D.C., for appellee.

Mark W. Bennett, Staff Counsel, Iowa Civil Liberties Union, Des Moines, Iowa, Charles S. Sims, American Civil Liberties Union Foundation, New York City, Peter M. Shane, Cooperating Atty., Iowa Civil Liberties Union, Iowa City, Iowa, David E. Landau, American Civil Liberties Union Foundation, Washington, D.C., for appellant.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges, en banc.

FAGG, Circuit Judge.

Gary John Eklund was convicted by a jury of willfully failing to register with the Selective Service System in violation of 50 U.S.C. app. §§ 453(a) and 462(a) and sentenced to imprisonment for two years. On appeal Eklund contends that the district court committed error in holding that his failure to register was not a completed offense at the expiration of the six-day registration period specified by Presidential Proclamation 4771, 45 Fed.Reg. 45,247 (1980), and that his continued failure to register after that time constituted a continuing offense. Eklund also contends that he was the victim of impermissible selective prosecution. Finally, he alleges that Proclamation 4771 and its implementing

regulations were promulgated without providing the required notice and comment period.

Male persons residing in the United States who are between the ages of eighteen and twenty-six (with certain exceptions not pertinent here) are required to register with the Selective Service as provided by the proclamation of the President and the Selective Service's rules and regulations. 50 U.S.C. app. § 453(a). President Carter initiated registration by issuing Presidential Proclamation 4771 on July 2, 1980. Upon signing it, the President said that he was "deeply concerned about the unwarranted and vicious invasion of Afghanistan by the Soviet Union and occupation by them of this innocent and defenseless country * * *." 16 *Weekly Compilation of Presidential Documents* 1274, 1274 (1980). Then the President stated that by initiating registration with the Selective Service, "we are expediting the process by which, if our Nation enters a time of emergency or a threat to our national security or a time of war in the future, the marshaling of our defense mechanisms can be expedited. It's a precautionary measure: it's designed to make our country strong and to maintain peace." *Id.* at 1275.

Although Eklund raises several issues on appeal, we observe at the outset that at bottom this case arose because of Eklund's failure to comply with the registration provisions implemented to protect the national security interests cited by President Carter.

## A. Selective Prosecution

On July 28, 1982, the Selective Service Director, testifying before a subcommittee of the House Judiciary Committee, estimated that approximately 674,000 young men had not registered with the Selective Service. *Statement of Thomas K. Turnage, Director of Selective Service, Before the Subcommittee on Courts, Civil Liberties and the Administration of Justice, Committee on the Judiciary, House of Representatives,* 2 (July 28, 1982). Eklund asserts that as of September 1982 all of the

13 men indicted for failure to register, including himself, were vocal opponents of the registration program. Accordingly, he contends that he was subjected to selective prosecution motivated by his exercise of his First Amendment right of free speech.

Eklund's prosecution resulted from a "passive enforcement" system initially relied upon by the government to identify nonregistrants; under that system only those who were reported to the government by themselves or others were prosecuted. On January 3, 1981, some six months after Presidential Proclamation 4771 was issued, Eklund wrote to the Selective Service System expressing his opposition to registration. He stated that he did not register in July 1980 and would not register in the future. He volunteered to be the first person to be prosecuted for failure to register, and requested that the government inform him whether he would be prosecuted in order to end the uncertainty. On June 24, 1981, Eklund received a letter from Selective Service reminding him of his duty to register and informing him that if he failed to register his name would be referred to the Justice Department for investigation and possible prosecution. The letter was accompanied by a registration form. Eklund's case was eventually referred by the Justice Department to the office of the United States Attorney for the Southern District of Iowa. On October 5, 1981, an attorney in that office sent Eklund a letter similar to the earlier letter from Selective Service and enclosed a registration form. On January 7, 1982, President Reagan announced a grace period for nonregistrants ending February 28, 1982. On August 24, 1982, an agent of the FBI personally delivered another letter from the office of the United States Attorney along with a registration form and additional information. All of these letters focused on securing Eklund's registration. The grand jury returned its indictment on August 31, 1982.

█ In assessing Eklund's claims of selective prosecution, the district court applied the two-part test set forth in *United*

*States v. Catlett*, 584 F.2d 864, 866 (8th Cir.1978):

> To establish the essential elements of a *prima facie* case of selective discrimination [sic], a defendant must first demonstrate that he has been singled out for prosecution while others similarly situated have not been prosecuted for conduct similar to that for which he was prosecuted. Second, the defendant must demonstrate that the government's discriminatory selection of him for prosecution was based on an impermissible ground, such as race, religion, or his exercise of his first amendment right to free speech. *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974).

"Moreover, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). Indeed, our legal system vests prosecuting authorities with broad discretion. *See Bordenkircher v. Hayes*, 434 U.S. 357, 365, 98 S.Ct. 663, 669, 54 L.Ed.2d 604 (1978). Accordingly, meeting the two requirements of the *Catlett* test in order to prevail on a defense of selective prosecution thus constitutes a "heavy burden." *United States v. Jennings*, 724 F.2d 436, 445 (5th Cir.1984). The *Catlett* standard requires a showing of "intentional and purposeful discrimination." *Catlett, supra*, 584 F.2d at 866. Eklund did not contest the validity of the *Catlett* standard in the district court, nor does he do so here. He argues as he must that his case fulfills the *Catlett* requirements.

The district court concluded that Eklund had been singled out for prosecution while others similarly situated had not been prosecuted. In making this determination, the district court defined the class of others similarly situated as "most other willful non-registrants who could be identified by an 'active' enforcement program." *United States v. Eklund*, 551 F.Supp. 964, 968 (S.D. Iowa 1982). The government contends that Eklund failed to meet the requirements of the first part of *Catlett*, and that the district court was in error on this

point. In view of our disposition of the second part of the *Catlett* test, however, we need not decide in this case whether Eklund received treatment different from others similarly situated, but for purposes of discussion we will assume that the district court properly defined the group of persons similarly situated and that Eklund was singled out from this group for prosecution.

The district court then went on to determine that Eklund had failed to establish that his selection for prosecution was based on an impermissible ground. *Id.* The district court noted that the government's passive enforcement system would result in prosecution of some persons who exercised their First Amendment right of free speech by publicly speaking out against the draft registration law. *Id.* The court concluded, however, that

> there is no showing that the selection of these people for prosecution was *based upon* their exercise of the First Amendment right to free speech. Defendant has not demonstrated that he is being prosecuted *because* he has expressed his opposition to the draft registration law. The undisputed evidence shows that defendant is being prosecuted because he purposely identified himself to the Selective Service System as a non-registrant and has persisted in refusing to register by rejecting repeated opportunities to register that were offered to him by the government.

*Id.* Eklund contends that at the least he made a threshold showing which entitled him to an evidentiary hearing. We disagree.

In *United States v. Catlett, supra*, 584 F.2d at 866, we noted that the following standards determine whether a hearing should be granted on a claim of selective prosecution:

> A hearing is necessitated only when the motion alleges sufficient facts to take the question past the frivolous state, *United States v. Erne*, 576 F.2d 212 (9th Cir.1978); *United States v. Oaks*, 508

F.2d 1403, 1404 (9th Cir.1974), and raises a reasonable doubt as to the prosecutor's purpose. *United States v. Peskin*, 527 F.2d 71, 86 (7th Cir.1975); *United States v. Falk*, 479 F.2d 616, 620–21 (7th Cir. 1973) (en banc). Without such a showing the criminal prosecution is presumed to have been undertaken in good faith and in a nondiscriminatory manner pursuant to a duty to bring violators to justice. *United States v. Falk, supra,* 479 F.2d at 620; *United States v. Ojala,* 544 F.2d 940, 943 (8th Cir.1976).

Eklund contends that the government impermissibly focused its prosecution efforts on the group of unregistered men who had exercised their First Amendment rights by expressing opposition to draft registration, and that his prosecution was a consequence of his membership in this group. A disproportionate impact on dissenters, however, does not alone raise "a reasonable doubt" that it was a purpose of the government's prosecution policy to select for prosecution on the basis of the exercise of a constitutional right. It must be kept in mind that Eklund's letter included a clear admission that he had violated the law. This admission is not itself protected speech. Thus if Eklund was chosen for prosecution on the basis of his admission, and not because he expressed opposition to draft registration, the government's purpose in prosecuting him would not have been different from that in any other case in which an admission of guilt provides the basis for prosecution. Accordingly, the crucial issue is whether Eklund made a showing under the second part of the *Catlett* test that in prosecuting him the government had an improper purpose or motive sufficient to warrant a hearing on his selective prosecution claim.

For his required showing, Eklund depends on numerous government documents, whose authenticity has been conceded by the government, which he submitted with his motion. Our analysis of the motion and documents leads us to conclude that Eklund has not made a showing sufficient to raise a reasonable doubt as to the government's purpose in prosecuting him

and hence to require a further evidentiary hearing. We have reached this conclusion after considering three grounds cited by Eklund to show discriminatory enforcement: the government's delay in implementing a broader enforcement system, statements contained in government memoranda, and the participation of high-level executive officials in the formulation of prosecutive policy.

### (a) Failure to implement a broader system

Eklund argues that the government, without undue administrative burden, could have adopted an enforcement system that would have been more inclusive and nondiscriminatory, and that its failure to do so is prima facie evidence of an improper motive. Eklund does not contend that the government was required from the outset to have in place a means to identify nonregistrants other than those who had expressed opposition to draft registration. He does maintain, though, that impermissible motivation for using the passive system, even initially, may be inferred from the government's tardiness in implementing an active enforcement system. We are unconvinced by the evidence Eklund adduced to support this argument.

The documents submitted with Eklund's motion reveal that government officials considered the use of both active and passive enforcement systems. In a memorandum to Attorney General Smith, dated July 14, 1981, D. Lowell Jensen noted that Selective Service was still "exploring ways to develop an 'active' enforcement system." There were impediments to implementation of an active enforcement system, however. It was not until December 1981, after Eklund's name had been referred to the Department of Justice for investigation, that 50 U.S.C. app. § 462 was amended to authorize the Secretary of Health and Human Services to provide Selective Service with Social Security data for use in an active identification process. Department of Defense Authorization Act, 1982, PL 97–86, Title IX, § 916(b), 95 Stat. 1099, 1129 (1981)

(codified at 50 U.S.C. app. § 462(e)). This bill had been pending in Congress since the spring of 1981, having first been considered by the Senate on May 14, 1981. *See* 1981 U.S.Code Cong. & Ad.News 1781. The President requested the necessary Social Security data early in 1982. Many addresses obtainable from Social Security files were obsolete, though, and when the government sought to acquire more reliable address information from the IRS, its efforts were rebuffed. Thus in the latter part of 1982 Selective Service implemented an alternative data-matching system using state driver's license records.

We view the government's decision to develop the passive enforcement system against both the backdrop of the government's intention ultimately to prosecute a greater number of nonregistrants and the problems encountered in its efforts to implement an active enforcement system. If the evidence indicated that the government had no plans to pursue an enforcement program of wider scope than the passive enforcement system, we might agree with Eklund that he had established a genuine question concerning the government's motive so as to warrant a hearing. In this case, however, the uncontradicted evidence shows that the government embarked on a long-range program to identify offenders, both vocal and silent, and prosecute them. As a consequence, we do not believe that Eklund has raised a reasonable doubt that the government's purpose in using its passive enforcement system was to select for prosecution on the basis of protected expression. We are therefore unwilling, merely on the basis of the evidence adduced by Eklund, to infer wrongful government motive.

What is more, Eklund has not shown that the passive system was implemented in a way which trenched on First Amendment values. It appears that enforcement measures against the nonregistrants proceeded because they had not complied with the law, not because their views were unacceptable to government officials. None of the documents adduced by Eklund suggest that the decision to prosecute an identified non-registrant was based on his expression of opposition to draft registration. Once the individual's name came to the government's attention the prosecutive mechanism was engaged. When Selective Service did not obtain Eklund's registration as a result of its letter to him, his name was submitted to the Justice Department. Eklund's name, along with several others, was sent by the Justice Department to the United States Attorney for the Southern District of Iowa. Eklund was the only one of these individuals who qualified for prosecution. Two of them registered, one was a woman, and others had moved from the district. The initiation and prosecution of the charge against Eklund was in harmony with Justice Department policy. Under that policy, Eklund was given ample opportunity to register and thus to avoid prosecution, but he refused to do so. The Justice Department focused on the individual's failure to register, not on his views, as described in a Justice Department memorandum: "[I]f a non-registrant registers prior to indictment no further prosecutive action will be taken." Memorandum from Jensen to United States Attorneys, July 9, 1982, *infra*. In addition, an Assistant United States Attorney made a professional statement that Eklund was not singled out for prosecution from among possible defendants and that presentation of Eklund's case to the grand jury was based on the strength of the case against him.

**(b) Statements of government officials**

A June 30, 1982 memorandum from Assistant Attorney General D. Lowell Jensen to F. Henry Habight II, Special Assistant to Attorney General Smith, regarding indictments of non-registrants contains the following statement:

> Before 3:00 p.m. we anticipate that a grand jury in the Southern District of California (San Diego) will return an indictment against an individual for failing to register with the Selective Service System * * *.

> This matter and the other non-registrant matters currently under investigation by

the Department of Justice are the result of either alleged non-registrants' reporting themselves or third parties reporting them to Selective Service. *Consequently the first prosecutions are liable to consist of a large sample of persons who object on religious and moral grounds and persons who publicly refuse to register.* (emphasis supplied in Eklund brief)

This language appears in a July 9, 1982 memorandum from Mr. Jensen to United States Attorneys:

Our prosecutive policy requires that United States Attorneys notify non-registrants by registered mail that, unless they register within a specified time, prosecutions will be considered. In most instances we anticipate that Federal Bureau of Investigation agents will also interview alleged non-registrants prior to the initiation of prosecutions. Nevertheless, if a non-registrant registers prior to indictment, no further prosecutive action will be taken.

The [passive enforcement] policy is designed to ensure that (1) the refusal to register is willful and (2) *only persons who are the most adamant in their refusal to register will be prosecuted.* The negative aspect of the policy is that if it becomes public, its provisions may act as a disincentive, until the last possible moment, to registration. Consequently, we request that United States Attorneys refrain from publicly disclosing policy concerning Selective Service non-registrant prosecutions. (emphasis supplied in Eklund brief)

An earlier memorandum of July 6, 1981, from David J. Kline, Senior Legal Advisor, Criminal Division, to Lawrence Lippe, Chief, General Litigation and Legal Advice Section, contains the following:

5. The general prosecutive policy for the first wave of referrals should be as follows:

a. All persons brought to our attention by Selective Service should be penalized if they should have registered.

b. All those who register between the time of referral to the Department of Justice and indictment should be offered the opportunity to participate in the pretrial diversion programs.

c. Those who refuse to register should be prosecuted.

Eklund relies principally on the emphasized portions of these excerpts, as well as similar language which appears in other documents adduced by him, and contends that the government consistently recognized that *"all* men whose names have been referred for prosecution—and therefore *all* men in fact prosecuted—will have protested against the draft and draft registration: the system cannot operate in any other manner." Appellant's Brief at 33 (emphasis in original). We disagree. The cited passages suggest only an awareness on the part of government officials that the class of persons prosecuted under the passive enforcement system would be heavily populated with vocal offenders. Awareness by government officials of this effect does not, without more, compel the inference that the prosecutions which resulted under this policy were motivated by the non-registrants' exercise of constitutional rights. Moreover, in context the government's policy that "only persons who are the most adamant in their refusal to register will be prosecuted" is related to its policy of offering non-registrants ample opportunity to register. Hence under this policy only those men who refuse to register when offered repeated chances to do so, i.e., those who are "adamant in their refusal," are prosecuted.

█ We are likewise unwilling to accept Eklund's assertion that only vocal protesters could and would be prosecuted under the passive system. The passive enforcement system was clearly designed to apply to nonvocal as well as to vocal offenders. Eklund has not shown that the government declined to prosecute known silent offenders, nor has he shown that the government pursued prosecution of any vocal offender who registered tardily. He argues only that impermissible motive is evidenced by

the government's choice initially to focus its enforcement policy upon those offenders whose names came to its attention either through their own action or the action of third persons. This argument flies in the face of precedent from this court, however. The government would naturally be motivated to prosecute those men who made public their violation of the law. Because of the publicity given such violators, failure to do so would only encourage others to violate the law. As a consequence, it is well established in this circuit that absent bad faith, selectivity based upon the amount of publicity a prosecution will receive falls well within the exercise of prosecutorial discretion. *United States v. Catlett, supra,* 584 F.2d at 868; *United States v. Ojala,* 544 F.2d 940, 944–45 (8th Cir. 1976); *see also United States v. Scott,* 521 F.2d 1188, 1195 (9th Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976). As this court stated in *United States v. Ojala, supra,* 544 F.2d at 945, with respect to a tax protestor:

> The government lacks the means to investigate and prosecute every suspected violation of the tax laws. Selection based in part upon the potential deterrent effect on others serves a legitimate interest in promoting more general compliance with the tax laws, which depend substantially upon a system of voluntary disclosure and reporting. It is difficult to conceive of a more legitimate object of prosecution than one who exploits his own public office and reputation to urge a political position by announcing publicly that he had gone on strike against the tax laws of the nation. (footnotes omitted)

Many of the considerations in *Ojala* also apply here. The record reflects the government's concern that delay in prosecuting non-registrants would adversely affect the registration program. The record also suggests that the prosecutions of non-registrants to date have been highly publicized.

The statements made by government officials, taken in context, indicate that those officials were attempting to avoid selective prosecution problems, not to create them. For instance, Assistant Attorney General Jensen advised the Selective Service:

> In order to avoid the risk of initial losses of non-registrant cases and the probable consequences of diminishing registrations, we believe that Selective Service must create a program of active identification which will be functioning, or well on the way toward functioning, at the time of the first non-registrant prosecution.

Letter From D. Lowell Jensen to Herbert C. Puscheck, Associate Director, Plans and Operations, Selective Service System (March 2, 1982), *quoted in United States v. Wayte,* 549 F.Supp. 1376, 1384 (C.D.Cal. 1982). Eklund points to the government's failure to implement a broader enforcement policy to support an inference of selective prosecution from the statements in the documents. As we have indicated above, however, ample justification for the delay in implementing a broadly based active enforcement system appears within the documents submitted by Eklund.

### (c) Participation of high-ranking government officials

Finally, Eklund relies upon the participation of the Presidential Military Manpower Task Force (Task Force) in the decisions regarding prosecution of non-registrants. The Task Force included, among others, the Counselor to the President, the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and the Director of Selective Service.

We are unwilling to infer improper motivation from the participation of high government officials in the formulation of the prosecution policy. "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *cf. Brewer v. United States,* 353 F.2d 260, 263 (8th Cir.1965), *quoting Gallego v. United*

*States*, 276 F.2d 914, 917 (9th Cir.1960). There is absolutely no indication that those high level officials intended to base the decision to prosecute on an individual's expression of opposition to the draft. The documents indicate that the Justice Department cautiously chose to avoid designating the districts in which the first prosecutions for failure to register would be commenced. Eklund concedes that no evidence that he was able to produce showed that he or any other individual was specifically targeted for prosecution. Surely it is not remarkable that high-ranking executive officials participated in formulating a policy for enforcement of laws pertaining to national security interests and involving hundreds of thousands of offenders, especially since it was contemplated that other executive agencies, specifically the IRS and the Social Security Administration, would become involved in the enforcement process.

**(d) Summary**

In our view Eklund's arguments on the selective prosecution issue fail to address the conclusions to be drawn from examination of the government's prosecutive policies as a whole. The record shows that Eklund was prosecuted because he refused to register for the draft, apprised the authorities of his refusal, volunteered to be prosecuted, and declined gratuitously offered opportunities to escape prosecution by registering. Eklund does not contend that *Catlett* is not controlling in this case, and we have no occasion to alter our rules for evaluating claims of selective prosecution in our resolution of his case. Hence, because he has not raised a reasonable doubt concerning the government's purpose in prosecuting him, Eklund has not made the showing necessary under *Catlett* which would entitle him to a hearing on his claim of selective prosecution. Eklund has not shown that his prosecution flowed from a motive on the part of the government to prosecute him on the basis of the exercise of First Amendment rights. Indeed, First Amendment values were not threatened, implicated, or involved in his prosecution.

**B. Continuing Offense**

**(a) Construction of 50 U.S.C. app. § 462(d)**

The district court held that 50 U.S.C. app. § 462(d) imposes a duty to register with the Selective Service which extends beyond the prescribed registration period and thus makes failure to register a continuing offense. 551 F.Supp. at 969. Consequently, commission of the offense of failure to register would continue for as long as the individual remains unregistered and under the age of 26. Eklund contends, however, that any violation of the law arising from his failure to register was a completed offense at the expiration of the six-day period established for registration by Presidential Proclamation 4771, and that his failure to register after this period could not constitute a violation of the law, or provide any basis for prosecution. He argues accordingly that the government was required to prove that he was located within the Southern District of Iowa during the prescribed six-day period to establish both venue and a duty on his part to register within that district. In addition, he maintains that the government was required to prove that his failure to register during the six-day period was willful. Eklund contends that the government did not meet its burden of proving his presence in the district and willfulness during the six-day period and that consequently the evidence is insufficient to support his conviction. If failure to register is a continuing offense, however, it is beyond question that the evidence is sufficient to support the guilty verdict.

The duty to register for the draft is imposed by 50 U.S.C. app. § 453(a), which provides in pertinent part:

> [I]t shall be the duty of every male citizen of the United States * * * who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be

determined by proclamation of the President and by rules and regulations prescribed hereunder.

The United States Supreme Court, in *Toussie v. United States*, 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970), held that section 453(a) did not impose a continuing duty to register, and hence that failure to register did not constitute a continuing offense. Toussie had failed to register within the six-day period beginning on his eighteenth birthday, as prescribed by presidential proclamation, or at any later time. He was indicted for failing to register eight years later, shortly before he reached age 26. Since at the time failure to register was governed by the general five-year statute of limitations, 18 U.S.C. § 3282, the issue was when that statute began to run. That issue, in turn, depended on when the offense of failing to register was complete. The Court noted that an offense should not be construed as a continuing one "unless the explicit language of the criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." 397 U.S. at 115, 90 S.Ct. at 860. The Court also examined this country's administration of its draft laws and concluded that, historically, "registration was thought of as a single, instantaneous act to be performed at a given time, and failure to register at that time was a completed criminal offense." *Id.* at 117, 90 S.Ct. at 861. The Court found that Congress had not expressed its intent that failure to register be a continuing offense, *id.* at 120, 90 S.Ct. at 863, and further determined that the nature of the crime of failing to register did not make it a continuing offense. *Id.* at 122, 90 S.Ct. at 864. The effect of the *Toussie* decision was that, since the indictment had not been handed down within the five-year statute of limitations period which began running six days after Toussie's eighteenth birthday, he was free of any possible penalty for his failure to register for the draft at the age of 23.

With but one minor exception section 453(a) remains unchanged since the *Tous-*sie decision, and Eklund thus invokes *Toussie* in support of his contention that his failure to register after the six-day period is not a basis for criminal liability. Eklund's reliance on *Toussie* does not take into account Congress' swift response to the decision. In 1971 it enacted P.L. 92–129, Title I, § 101(a)(31), 85 Stat. 348, 352 (1971) (codified at 50 U.S.C. app. § 462(d)), which provides that a person may be prosecuted for failing to register for the draft as late as five years after he attains the age of 26:

> No person shall be prosecuted, tried, or punished for evading, neglecting, or refusing to perform the duty of registering imposed by section 3 of this title [section 453 of this Appendix] unless the indictment is found within five years next after the last day before such person attains the age of twenty-six, or within five years next after the last day before such person does perform his duty to register, whichever shall first occur.

*Id.* It is, of course, a commonplace that "it is the duty of a court in construing a law to consider the circumstances under which it was passed and the object to be accomplished by it." *United States v. Anderson*, 76 U.S. (9 Wall.) 56, 65–6, 19 L.Ed. 615 (1869). The early response of Congress to the *Toussie* opinion is thus an important indication of its intention to change the law upon which *Toussie* was based.

Eklund contends that section 462(d) serves only to extend the statute of limitations to a maximum period of 13 years and should not be construed as altering the substance of the offense of failing to register. To be sure, section 462(d) refers to "the duty of registering imposed by section 3 of this title [section 453 of this Appendix]" which the Supreme Court construed in *Toussie* as a "single, instantaneous act to be performed at a given time." 397 U.S. at 117, 90 S.Ct. at 861. The government, on the other hand, urges that the language of section 462(d) mandates the conclusion that Congress intended section 462(d) to establish a continuing duty to register, and

to establish that failure to register is a continuing offense which extends beyond the six-day period set for registration. In resolving this conflict, we must bear in mind that matters of military policy are particularly within the purview of congressional decision-making, and the courts should respect the power given Congress to legislate regarding military matters. *See Rostker v. Goldberg*, 453 U.S. 57, 64–67, 101 S.Ct. 2646, 2651–2653, 69 L.Ed.2d 478 (1981).

■ Eklund relies on the "rule of lenity," a principle of statutory construction which provides that criminal statutes must be strictly construed, and any ambiguity resolved in favor of lenity, citing *United States v. Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973). Nevertheless, "[t]he Court has emphasized that the 'touchstone' of the rule of lenity 'is statutory ambiguity.' *See e.g. Lewis v. United States*, 445 U.S. 55, 65, 100 S.Ct. 915, 920, 63 L.Ed.2d 198 (1980). *Where Congress has manifested its intention, we may not manufacture ambiguity in order to defeat that intent." Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (emphasis added). The rule of lenity is to be applied "only when we are uncertain about the statute's meaning and [is] not to be used 'in complete disregard of the purpose of the legislature.' " *Scarborough v. United States*, 431 U.S. 563, 577, 97 S.Ct. 1963, 1970, 52 L.Ed.2d 582 (1977), *quoting United States v. Bramblett*, 348 U.S. 503, 510, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955). Moreover, the rule of lenity "cannot provide a substitute for common sense, precedent, and legislative history." *United States v. Standard Oil Co.*, 384 U.S. 224, 225, 86 S.Ct. 1427, 1428, 16 L.Ed.2d 492 (1966). Hence, "Congress' lack of precision in drafting legislation should never be an instrument for defeating or frustrating the manifest purpose and intent of Congress, as revealed by the legislative history." *Premachandra v. Mitts*, 727 F.2d 717, 727 (8th Cir.1984). In numerous cases the Supreme Court has examined the legislative history of criminal statutes to aid in inter-pretation. *See, e.g., Scarborough v. United States, supra*, 431 U.S. at 577, 97 S.Ct. at 1970 ("history is unambiguous and the text consistent with it"). Accordingly, we now turn to an examination of the language of section 462(d) and its legislative history.

■ In our view the language of section 462(d) compels the conclusion that the duty to register is a continuing one, thus supplying the indication of congressional intent found lacking by the Supreme Court in *Toussie*, and that failure to fulfill that continuing duty is a continuing offense. Section 462(d) refers explicitly to the duty to register imposed by section 453. The two sections are thus linked together and in combination they impose the duty to register and define the contours of the obligation. Because the two sections relate to the same subject matter, they should both be taken into consideration in construing either of them "as if they were one law." *United States v. Freeman*, 3 How. 556, 564, 11 L.Ed. 724 (1845). The latter part of section 462(d) specifies that the five-year period of limitation begins to run on "the last day before such person does perform his duty to register." The statute thus indicates that the duty continues after expiration of the period specified by proclamation for registration and provides an incentive for tardy registration before age 26.

If the duty to register does not continue after the original registration period, however, it would be impossible for a man to perform that duty tardily and thus gain the benefit of the shortened limitations period provided by section 462(d). Unless the duty is a continuing one, its performance could only be accomplished at a time before any violation of the law had been committed. A narrow interpretation of the duty would have the effect of perpetuating the *Toussie* Court's characterization of the duty, which Congress by enacting section 462(d) sought to change. We conclude that the language used in the latter part of section 462(d), giving recognition as it does to a "person" who indeed "does perform

his duty to register," contemplates that the duty is a continuing one, for to interpret the statute otherwise would render part of it ineffective. "It is well established that statutes will not be interpreted as though Congress enacted superfluous provisions." *Conway County Farmers Association v. United States,* 588 F.2d 592, 598 (8th Cir. 1978). We thus find that a continuing duty to register is implicit in section 462(d) and that accordingly a breach of the duty constitutes a continuing offense.

■ Further, with respect to the continuing offense question, section 462(d) imposes a five-year limitations period that, for a person who never registers, does not begin to run until the person reaches age 26. As noted, however, the limitations period begins to run upon late registration before age 26. A statute of limitations does not normally begin to run until the offense is complete. *Toussie v. United States, supra,* 397 U.S. at 115, 90 S.Ct. at 860; *Pendergast v. United States,* 317 U.S. 412, 418, 63 S.Ct. 268, 270, 87 L.Ed. 368 (1943). We believe in this case the converse is also true, and that the offense is not complete until the statute of limitations begins to run. Since the times at which the limitations period begins to run are firmly established by section 462(d), we may determine when the offense is complete by identifying the beginning of the running of the limitations period. We thus conclude it is implicit in the limitations mechanism of section 462(d) that failure to register is a continuing offense.

We next look to the legislative history to ascertain whether Congress intended by enactment of section 462(d) to make failure to register a continuing offense. *Cf. United States v. Cores,* 356 U.S. 405, 409–10, 78 S.Ct. 875, 878–79, 2 L.Ed.2d 873 (1958) (legislative history consistent with interpretation that alien crewman's willfully remaining in United States is continuing offense for venue purposes). Our conclusion based on analysis of the language of section 462(d) is strongly supported by its legislative history.

Section 462(d) was proposed by the Selective Service System which saw the amendment as a way of making the duty to register a continuing one, given the Court's reluctance to imply a continuing offense in the face of Congressional silence. *See United States v. Toussie, supra,* 397 U.S. at 120, 90 S.Ct. at 863. The Director of the Selective Service System, Dr. Curtis W. Tarr, testified that "the only thing at issue here is whether the Congress wants to make the requirement for registration a continuing requirement * * *." *Extension of the Draft and Bills Related to the Voluntary Force Concept and Authorization of Strength Levels: Hearings Before the House Committee on Armed Services,* 92d Cong., 1st Sess. 165 (1971). He also testified before the Senate Committee on Armed Services:

> Many of you are aware of the problems introduced by the *Toussie* case, in which the Supreme Court decided that a man who had failed to register for the draft at age 18 no longer was liable for that failure if Federal authorities did not indict him within 5 years. *I feel certain that Congress expected the requirement to register at 18 to be a continuing requirement. The language we have proposed* for a change in the law *would overcome the weakness* in the present law as interpreted recently by the Supreme Court. (emphasis added)

*Selective Service and Military Compensation: Hearings Before the Senate Committee on Armed Services,* 92d Cong., 1st Sess. 74 (1971).

The conclusion that the Selective Service System viewed section 462(d) as establishing a continuing duty to register is buttressed by the fact that on September 2, 1972, it amended its regulations and eliminated the language imposing a continuing duty to register found in 32 C.F.R. § 1611.-7(c), in effect at the time of the *Toussie* decision. 37 Fed.Reg. 17,963 (1972). Before the *Toussie* decision several courts of appeals had held in reliance on this continuing duty regulation that failure to register was a continuing offense. *See McGregor v. United States,* 206 F.2d 583, 584 (4th

Cir.1953); *Gara v. United States*, 178 F.2d 38, 40 (6th Cir.1949), *aff'd by an equally divided Court*, 340 U.S. 857, 71 S.Ct. 87, 95 L.Ed. 628 (1950); *Fogel v. United States*, 162 F.2d 54, 55 (5th Cir.), *cert. denied*, 332 U.S. 791, 68 S.Ct. 99, 92 L.Ed. 373 (1947). The rescission of 32 C.F.R. § 1611.7(c) following enactment of section 462(d) indicates that Selective Service believed it was no longer necessary to rely on its regulations to find a continuing duty to register and a continuing offense upon failure to do so. Current Selective Service regulations merely recognize that persons will perform their duty by presenting themselves for registration at times other than the fixed day or days. 32 C.F.R. § 1615.2 (1983).

 To be sure, present Selective Service regulations made effective July 18, 1980, do not contain a provision imposing a continuing duty to register. 45 Fed.Reg. 48,130 (1980) (codified at 32 C.F.R. §§ 1615.1–1615.9). The Court held in *Toussie*, however, that the continuing duty regulation then in effect could not be relied upon to make failure to register a continuing offense. 397 U.S. at 121. Thus the Court held that the regulation was not sufficient to make failure to register a continuing offense. Similarly, we conclude that neither is the existence of such a regulation necessary to find that failure to register is a continuing offense. It would be contrary to the reasoning of *Toussie* to make the determination whether failure to register is a continuing offense turn on the existence or nonexistence of an administrative regulation. *Toussie* supports the proposition that whether an offense is a continuing one is for Congress to determine, and not contingent on administrative regulations. *Id.*

Section 462(d) is phrased as a statute of limitations because it was the issue of limitation of prosecution with which Congress was presented as a result of *Toussie*. It is clear, however, that the purpose of section 462(d) went beyond merely setting forth the applicable statute of limitations. By enacting section 462(d) Congress sought to remedy what it saw as an inequity created by the *Toussie* decision between those who registered and those who did not. Registration is a precondition to induction, *Rostker v. Goldberg, supra*, 453 U.S. at 75, 101 S.Ct. at 2657, and hence Congress concluded that as a result of *Toussie* a man who did not register was not only immune from prosecution beginning the sixth day after his twenty-third birthday, but was also immune from induction beginning the sixth day after his eighteenth birthday. In contrast, a man who fulfilled his duty to register was subject to induction until age 26. The basis for the Supreme Court's decision in *Toussie* was that Congress had not clearly expressed an intention that the duty to register be considered a continuing one. In acting to remedy the inequity it perceived, Congress sought to express its intent that the duty to register be considered a continuing one. Accordingly, Congress enacted a wholly new limitations period provision which in our view accomplished its purpose by imposing a continuing duty to register and making the failure to do so a continuing offense.

Support for our conclusion appears throughout the legislative history of section 462(d). Concerning H.R. 6531, the House Committee on Armed Services reported:

Clause 23 of Section 1 of the bill amends Section 12 of the Military Selective Service Act by adding a new Subsection (d) *extending the period before which the Statute of Limitations begins to run* in order to permit prosecution of draft evaders until the age of 31.

The language added here provides that the Statute of Limitations does not begin to run until the last day before the date on which a man registers or on the date on which he attains age 26, whichever occurs first. For a non-registrant this will allow prosecution for five years after his 26th birthday. This change is appropriate not only as *a device to emphasize the continuing requirement of registration but also as a reflection of equity to those men who comply with*

*the registration requirements and remain liable until age 26.*

H.R.Rep. No. 82, 92d Cong., 1st Sess. 17 (1971) (emphasis added). In S.R. No. 93, 92d Cong., 1st Sess. 22 (1971), *reprinted in* 1971 U.S.Code Cong. & Admin.News, 1439, 1455–56, the following discussion was included:

> The House version included a provision recommended by the Administration by adding a new subsection 5(d) which will overcome the result of Toussie v. United States, 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). That opinion interpreted the Act to limit the time for prosecuting men who fail to register to five years and five days after a man's 18th birthday. The Committee language will allow the prosecution of a nonregistrant up to five years after his 26th birthday. It does not change the statute of limitations for any other violation of Selective Service law. This change is deemed appropriate not only as a deterrent to nonregistration but also as a reflection of equity to those men who comply with the Act's registration requirements and remain liable at least to age 26. (emphasis added)

In much of the debate preceding the enactment of P.L. 92–129, it is apparent that members of Congress were of the view that the purpose of section 462(d) was to make the duty to register a continuing one, and failure to register a continuing offense, and thus to remedy the inequity created by *Toussie.* On June 7, 1971, Senator Gravel offered an amendment, Amendment No. 122, deleting the provisions of section 462(d) from the bill. 117 Cong.Rec. 18444 (1971). In offering his amendment, Senator Gravel stated: "I rise to speak in opposition to amending the present Selective Service Act so as to make failure to register under it a continuing offense." *Id.*

Speaking in opposition to the amendment, Senator Byrd, a member of the Armed Services Committee, replied:

> Amendment No. 122 would continue to perpetuate what the House of Representatives feels and what the committee felt is an inequity and which the committee bill sought to end. The committee bill, in effect, declares that *an individual has a continuing responsibility to register* with the Selective Service until the age of 26. Consequently, *if at the age of 26 a young man has failed to fulfill his responsibility* to register, *the 5-year statute of limitations will begin to run* and the registrant would be liable for prosecution until the age of 31.

*Id.* at 18445 (emphasis added).

Senator Byrd later stated:

> The Supreme Court in *Toussie v. United States,* 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970) *interpreted congressional intent as being that failure to register is a single act.*
>
> \* \* \* \* \* \*
>
> Consequently, it ruled that prosecution could not take place once a registrant reached the age of 23 years, 5 days. *Amendment No. 122 would uphold the Court's reading of congressional intent* and would perpetuate the inequity created by it. For instance, if a young man does not register \* \* \* when he is eighteen and remains unnoticed until after his 23rd birthday, he is not subject to prosecution \* \* \*. And if he has not registered, he certainly could not be inducted into the Armed Forces.
>
> Meanwhile, the individual who complies with the law by registering \* \* \* is liable for induction to age 26. Amendment No. 122 would only continue to perpetuate this inequity which the committee bill sought to end. *The committee bill, in effect, declares that an individual has a continuing responsibility to register \* \* \*.*

*Id.* at 18446 (emphasis added).

Senator Stennis, Chairman of the Armed Services Committee, stated:

> Here are two young men living on opposite sides of the street. They become 18 years of age on the same day. One goes down to the proper place and registers according to law. He responds to his

draft board and does everything they tell him to do. If he is sent to Vietnam, he goes.

The young man on the other side of the street decides not to register, and does not do so in the intervening 8 years until he is 26 years old. He disappears somewhere, in some way. He does not obey anything * * *.

*That is what we call in law a continuing offense. He continues to be liable to register, but the statute of limitations barring prosecution will not begin to run until his 26th birthday. It runs 5 years further.*

 * * * * * *

* * * *This principle of a continuing crime is basic law.* The matter of deferment has nothing to do with it.

*The Supreme Court decision said that the congressional intent was not clear.* Therefore, it said he could not be prosecuted after 5 years. *We want to make congressional intent clear to the effect that he is not going to be relieved from being punished 5 years after this 18th birthday.*

*Id.* at 18769–71 (emphasis added).

Finally, Senator Thurmond, also a member of the Armed Services Committee, stated:

The provision that such statute of limitations *begin* at age 26 was *proposed by the Selective Service System in the present legislation and has been approved by the House of Representatives and recommended by the Senate Armed Services Committee.*

The Supreme Court in *Toussie v. United States,* 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970) interpreted congressional intent as being that failure to register is a single act. * * * Mr. Gravel's amendment would uphold the Court's reading of congressional intent and would perpetuate the inequity created by it.

 * * * * * *

* * * *The committee bill, in effect, declares that an individual has a con-*

*tinuing responsibility to register* with selective service until age 26.

Thus, *if at age 26 the young man has failed to fulfill his responsibility to register, the 5-year statute of limitations would begin to run* and the registrant would be liable for prosecution until age 31.

*Id.* at 18770 (emphasis added).

After the debate, Senator Gravel's amendment was rejected by a vote of 63 to 15. *Id.* at 18771.

The House also considered and rejected an amendment to H.R. 6531, introduced by Congressman Mikva, that would have stricken the language of section 462(d). *See* 117 Cong.Rec. 9005–9007 (1971). As was Senator Gravel, Congressman Mikva was concerned with the lengthy period of exposure to prosecution contemplated by section 462(d). Nonetheless, Congressman Mikva expressed his understanding that the duty to register should be a continuing one:

Let me also make clear that nothing in my amendment would limit the person's continuing obligation for the draft through age 26 like anybody else. I am not suggesting that they should get any bootstrap benefits by failing to register.

*Id.* at 9006. In response to another member's comment, Congressman Mikva replied:

The gentleman is not suggesting that the man at the age of 23 is free of his obligation to register. Of course, that continues until his 26th birthday.

*Id.* Similarly, Congressman Arends, a co-sponsor of H.R. 6531, *see id.* at 7641, remarked, "[A] man is liable for registration from age 18 to age 26." *Id.* at 8636.

These excerpts supply a consistent and clear indication of Congressional intent that the duty to register be a continuing one, and thus provide the expression of congressional intent the Court found lacking in *Toussie.* Eklund seeks to separate the continuing duty to register from the issue whether failure to register is a continuing offense, arguing that the referenc-

es in the legislative history to a continuing duty are ambiguous and thus insufficient to reach the level of certainty required by *Toussie* before a continuing offense can be inferred. He contends that failure to perform a continuing duty does not necessarily give rise to a continuing offense, arguing that, for instance, failure to file a timely tax return is not a continuing offense even though Congress provides a legal incentive for the tardy performance of that duty and thus contemplates that the obligation to perform it is a continuing one. He also points to the fact that Congress apparently never considered the ramifications of making the failure to register a continuing offense, other than in the statute of limitations context.

As the foregoing discussion indicates, however, we do not characterize the legislative history as ambiguous and inconsistent. As we noted earlier, it is clear that Congress, in enacting section 462(d), was reacting to the Supreme Court's determination in *Toussie* that failure to register was not a continuing offense. This intent is evidenced by the very language of the provision Congress enacted. The language of section 462(d) is consistent with our interpretation of its legislative history. Moreover, the language of section 462(d) can be given full effect only when interpreted in harmony with the intent of Congress to make failure to register a continuing offense. *Ante* at 1297–1298. It is also clear that Congress' reaction was motivated by a desire to devise an efficient and fair registration scheme, rather than, as Eklund's theory suggests, to effect punishment of nonregistrants. We conclude that Congress obviously sought to establish a continuing duty to register, and intended that failure to comply with this continuing duty be treated as a continuing offense. While it is true that Congress did not discuss the impact of its action on proof of venue and willfulness, there is no requirement that it have done so. The effects on venue and proof of willfulness about which Eklund complains flow normally from the act of establishing failure to register as a continuing offense.

We observe finally that even prior to enactment of section 462(d) the Supreme Court in *Toussie* noted that the government's posited construction of section 453, as imposing a continuing duty to register, was not without some support. *Toussie, supra*, 397 U.S. at 116, 90 S.Ct. at 860. The Supreme Court's decision in *Toussie* stemmed largely from the lack of clear expression of congressional intent. 397 U.S. at 120, 90 S.Ct. at 863. Congress has now provided a clear expression of intent.

**(b) Due Process**

■ Eklund next contends that if we construe section 462(d) as establishing that failure to register is a continuing offense, the provision is then impermissibly vague because it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954). We disagree. The continuing duty concept implicit in section 462(d) admittedly is not as clearly expressed as it could be. Nevertheless, as the Supreme Court stated in *United States v. Powell*, 423 U.S. 87, 94, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975) *quoting United States v. Petrillo*, 332 U.S. 1, 7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1947), "[t]he fact that Congress might, without difficulty, have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague."

The Supreme Court in *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972), described three important values offended by vague laws: (1) "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," (2) that those charged with enforcing the laws be guided by explicit standards, to prevent arbitrary and discriminatory enforcement, and (3) that the exercise of First Amendment freedoms not be inhibited. Only the first value involving fair warning is brought into question by Eklund in this

case. We conclude that the statute gives fair warning. As our earlier discussion indicates, we believe that the continuing duty and continuing offense concepts are implicit in the wording of section 462(d). We conclude that the statute is not prejudicially vague. In reaching this conclusion, we rely in part on the fact that one who fails to register must "knowingly" do so before he is guilty of an offense. 50 U.S.C. app. § 462(a). In *Hoffman Estates v. The Flipside, Hoffman Estates*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982), the Supreme Court noted that "the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."

### C. Improper Promulgation of Proclamation 4771 and Implementing Regulations

#### (a) Proclamation 4771

■ Eklund contends that Presidential Proclamation 4771 was void for lack of compliance with the notice and comment requirement of 50 U.S.C. app. § 463(b). The proclamation specified the dates for registration; if the proclamation was invalid, there would be no duty to register. Section 463(b) provides in part as follows:

[N]o regulation issued under [the Selective Service] Act shall become effective until the expiration of thirty days following the date on which such regulation has been published in the Federal Register. After the publication of any regulation and prior to the date on which such regulation becomes effective, any person shall be given an opportunity to submit his view to the Director on such regulation, but no formal hearing shall be required on any such regulation.

Eklund argues that although section 463(b) refers only to "regulations," the terms "proclamation" and "regulation" should be considered interchangeable. The government argues on the other hand that Proclamation 4771 was not subject to the notice and comment requirement of section 463(b),

citing *United States v. Wayte*, 710 F.2d 1385 (9th Cir.1983).

We agree with the conclusion expressed by the court in *Wayte:*

Section 453 of the Selective Service Act provides that men shall register at that time and place and in that manner "determined by *proclamation* of the President *and* by *rules and regulations* prescribed hereunder." 50 U.S.C.App. § 453(a) (emphasis added). In light of Congress' reference to proclamations and regulations in that section, its § 463(b) reference to regulations alone indicates that proclamations do not fall within the notice and comment requirement.

*Id.* at 1388–89. Accordingly, we reject Eklund's contention.

#### (b) Selective Service Regulations

■ Finally, Eklund contends that Selective Service regulations implementing the registration program were promulgated without sufficient public notice, and that consequently the indictment should be dismissed. He cites the 60-day notice and comment period for proposed regulations imposed by the Director of Selective Service, 43 Fed.Reg. 50,980, 50,981 (1978), and points to the fact that the regulations in question, 32 C.F.R. §§ 1615.1–1615.9 (1980), were issued in final form on July 18, 1980, *see* 45 Fed.Reg. 48,130, only 32 days after notice of the proposed regulations was published on June 16, 1980. *See* 45 Fed.Reg. 40,577. We agree with the court in *United States v. Wayte, supra,* 710 F.2d at 1389, that the 60-day notice and comment period requirement was imposed in accordance with Executive Order 12044, 43 Fed.Reg. 12,661, 12,662 (1978), which is judicially unenforceable. *See Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234–36 (8th Cir.), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976).

The judgment of the district court is affirmed.

LAY, Chief Judge, dissenting, with whom HEANEY, McMILLIAN and ARNOLD, Circuit Judges, join.

I respectfully disagree with the majority's analysis in both the *Eklund* and *Mar-*

*tin* cases that §§ 453(a) and 462(d) of Title 50 U.S.C. provide a continuing duty to register for the draft. The difficulty I have with the majority's analysis is that it misinterprets the significance of several factors. I have no difficulty with the extended discussion of the legislative history, nor as to what Congress thought it was doing when it amended the statute of limitations. The Supreme Court held in *Toussie v. United States*, 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970), that Congress did not intend failure to register under 50 U.S.C. app. § 453 to be a continuing offense because the five-year statute of limitations, then existing, was to begin when the crime was completed. There should be little doubt that Congress set out to change the result in *Toussie*, that is, to amend the statute of limitations in order to allow prosecution of the failure to register for the draft on a *continuing basis*.[1] The problem is that the majority allows the congressional history to override the plain meaning of the statute.

Three significant factors compel the conclusion that, at the time Martin[2] and Eklund[3] were indicted, no continuing duty to register existed. First, at the time *Toussie* was decided, there existed a regulation under the Act which provided: "The duty of every person subject to registration ... shall continue at all times, and if for any reason any such person is not registered on the day or one of the days fixed for his registration, he shall immediately present himself for and submit to registration ...." 32 CFR § 1611.7(c).

Second, the congressional debates reflect that, at the time Congress sought to amend the statute of limitations in order to allow prosecution for failure to register as a continuing event, Congress was well aware that the regulation establishing a continuing duty to register was still in existence. *See generally* 117 Cong.Rec. 18,438–47 (1971). The congressional debates simply recognized the need to extend the statute of limitations to give effect to the continuing duty regulation then in existence.

And third, at the time Eklund and Martin were charged for failing to register, not only had the regulation establishing a continuing duty to register been *eliminated*, but when new regulations were promulgated in 1980, *they did not include a continuing duty to register*. *Cf.* 32 CFR § 1615 (1982).

At the time of the amendment extending the statute of limitations, 32 CFR § 1611.7 was still in effect. In order to alter the result in *Toussie*, Congress passed § 462(d):

> No person shall be prosecuted, tried, or punished for evading, neglecting, or refusing to perform the duty of registering imposed by section 3 of this title [section 453 of this Appendix] unless the indictment is found within five years next after the last day before such person attains the age of twenty-six, or within five years next after the last day before such person does perform his duty to register, whichever shall first occur.

It is clear from the majority's discussion of the congressional debates that Congress sought to extend the statute of limitations, and thus to change the result of *Toussie*,

---

**1.** In addition to overruling *Toussie,* Congress's purpose in extending the statute of limitations was to provide equitable treatment to registrants, who were subject to induction until age 26. As Senator Byrd recognized:

[T]he purpose of this is not to take punitive action but to prevent what the selective service people feel, what the House of Representatives evidently thought, and what the committee feels is presently discriminatory, in that it in effect allows a 23 year old who has violated the law to be free from both prosecution and military service, while the law-abiding young man remains eligible for induction

until he is 26. Most people felt that was discrimination in the present law. That is the purpose of the change. Whether that discriminatory aspect should be changed, of course, is debatable; but that was the purpose of it, not to be punitive, but to do away with what the House felt and the committee felt is discriminatory at the present time.
117 Cong.Rec. 18,445–46 (1971).

**2.** Martin was indicted on October 5, 1982.

**3.** Eklund was indicted on August 31, 1982.

by giving effect to the *then existing* regulation which made nonregistration a continuing offense.[4] The Supreme Court stated in *Toussie* that any criminal offense should not be construed as a continuing one "unless the *statute itself* . . . justifies that conclusion."[5] *Toussie*, 397 U.S. at 121, 90 S.Ct. at 863 (emphasis added).

We then turn to the substantive provisions of § 453. The statute reads:

§ 453. Registration.

[I]t shall be the duty of every male citizen of the United States . . . who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined *by proclamation of the President and by rules and regulations* prescribed hereunder.

50 U.S.C. app. § 453(a) (emphasis added).

At the times Eklund and Martin were charged for failing to register, the proclamation of President Carter issued on July 2, 1980, provided in pertinent part as follows:

1-1. *Persons to be Registered and Days of Registration.*

1-101. Male citizens of the United States and other males residing in the United States, unless exempted by the Military Selective Service Act, as amended, who were born on or after January 1, 1960, and who have attained their eighteenth birthday, shall present themselves for registration in the manner and at the time and places as hereinafter provided.

1-102. Persons born in calendar year 1960 shall present themselves for registration on any of the six days beginning Monday, July 21, 1980.

Proclamation No. 4771, 45 Fed.Reg. 45,247 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 7624-25. It should be clear that the Presidential Proclamation did not make the offense a continuing one. It is precise and limits the time for registration of an 18 year old male to six days beginning July 21, 1980.

---

**4.** The majority appears to assert that *Toussie* rendered any regulations promulgated by the Selective Service ineffective. *Supra* at 23. However, *Toussie* itself anticipated and rebutted this interpretation.

Although at the time of the *Toussie* opinion, the regulation existed making the duty to register a continuing one, the Supreme Court held that "this regulation should not be relied upon effectively to stretch a five-year statute of limitations into a 13-year one." *Toussie*, 397 U.S. at 121, 90 S.Ct. at 863. Justice White's dissent contended that the majority was holding the regulation to be without authority. *Id.* at 127, 90 S.Ct. at 866. However, Justice Black responded in footnote 17 that Justice White's interpretation was not correct. Justice Black observed:

It is significant that the courts that have concluded that failure to register is a continuing offense have done so by relying explicitly on the regulation. See *Fogel v. United States*, 162 F.2d 54, 55 (5th Cir.), *cert. denied*, 332 U.S. 791, 68 S.Ct. 99, 92 L.Ed. 373 (1947); *McGregor v. United States*, 206 F.2d 583, 584 (4th Cir.1953); *Gara v. United States*, 178 F.2d 38, 39 (6th Cir.1949), *aff'd by an equally divided Court*, 340 U.S. 857, 71 S.Ct. 87, 95 L.Ed. 628 (1950); and the opinions below in this case, 280 F.Supp., at 474, 410 F.2d, at 1157. *It is equally significant that the only court that*

concluded that the offense was not a continuing one did so at a time when there was no "continuing-duty" regulation issued to implement the registration provisions. *United States v. Salberg*, 287 F. 208 (N.D.Ohio 1923), *interpreting the 1917 Draft Act, held that failure to register was not a continuing offense.* The first continuing-duty regulation was promulgated in 1941. . . . These decisions support our conclusion that the statute itself, apart from any reliance on the administrative regulation, does not require that it be construed to incorporate a continuing-offense theory. *We do not hold, as the dissent seems to imply, . . . that the continuing duty regulation is unauthorized by the Act.* All we hold is that neither the regulation *or the Act itself requires that failure to register be treated as the type of offense that effectively extends the statute of limitations.*

*Id.* at 121 n. 7, 90 S.Ct. at 863 (emphasis added) (citations omitted).

**5.** It is clear that Congress knows how to make words explicit and provide for a continuing duty. At the time of the 1971 amendment to the Act, legislation existed which stated that "any registrant who has failed or refused to report for induction shall *continue* to remain liable for induction." 50 U.S.C. app. § 454 (1970) (emphasis added).

The Act recognizes as well that the Director of the Selective Service System may promulgate "rules and regulations" as to the time and place to register.[6] 50 U.S.C. app. § 453(a). Following the amendment to the statute of limitations, on April 1, 1975, President Ford discontinued the procedures for registration under the Military Selective Service Act. Proclamation No. 4360, 40 Fed.Reg. 14,567 (1975), *reprinted in* 1975 U.S.Code Cong. & Ad.News 2490. When President Carter reactivated the draft process on July 2, 1980, he issued Proclamation No. 4771 ordering registration of young men. It is significant that on July 18, 1980, three days before registration was to begin, regulations were published governing the administration of the registration. 45 Fed.Reg. 48,130 (1980) (codified in 32 C.F.R. § 1615). Noticeably absent from those regulations was any continuing duty regulation. *Cf.* 32 C.F.R. 1615.

The government argues that the reason the regulation was not reenacted and that *Toussie* may now be disregarded is that Congress by amending the statute of limitations had provided a continuing duty to register. The government provides no authority for this statement. Furthermore, the reasoning proffered to support this statement is critically flawed. There is nothing in § 462(d) which sets forth the time period during which a young man must register other than a reference back to § 453. Section 453 is the substantive offense and refers specifically to the time and place, "as shall be determined by Proclamation of the President" and the promulgated rules and regulations.[7] Thus, the Presidential Proclamation requiring regis-

tration within six days of July 21, 1980, defines the period during which Eklund's and Martin's failure to register occurred. The government's position to the contrary ignores the plain wording of the statute.

Conclusion

If the intent of Congress was purposely to make the substantive offense of failure to register a continuing duty, Congress had an obligation to make that duty explicit and understandable. *Toussie*, 397 U.S. at 113, 90 S.Ct. at 859. There is not one word or sentence in the Act itself, in the Presidential Proclamation, or in the regulations that requires a registrant to register beyond the times specified in the President's Proclamation. When a statute is explicit and narrowly sets out the specific time period in which registration is required, I think we should apply the plain wording of the statute as it exists. Regardless of the length of time in which a prosecution may proceed, substantive provisions of the Act clearly delegate to the President and the Selective Service Administration authority to specify the time and place for registration.

I therefore dissent.[*]

HEANEY, Circuit Judge, dissenting, with whom LAY, Chief Judge, and McMILLIAN and ARNOLD, Circuit Judges, join.

Registration for the draft is an important obligation of citizenship. The Justice Department has the duty to prosecute those who evade that obligation. It obviously does not have the resources to prosecute each of the estimated 674,000 young men who have failed to register. It can, however, be held accountable for developing

---

**6.** Equally significant here, as it was in *Toussie*, is the Supreme Court's observation that "from the Selective Service System's viewpoint the process of registration is a 'continuing' one. But from the registrant's viewpoint the obligation arises at a specific time." *Toussie*, 397 U.S. at 119, 90 S.Ct. at 862.

**7.** Under the majority's analysis I wonder how a court would solve the following hypothesis: Suppose the President by Proclamation or the Selective Service by regulation stated that registration should take place within six days after

the registrant's 18th birthday and that the duty to register would continue for one year thereafter. Would the Proclamation or regulation, which is specifically referred to in § 453, then control or would the majority's interpretation of § 462(d) as requiring a continuing duty to register for eight years control? The absurdity of it all is that under the majority's analysis the Proclamation or regulation would be read out of the statute.

---

[*] I concur in part C of the majority opinion.

and implementing a neutral process for selecting those it prosecutes. In my view, Gary John Eklund presented sufficient evidence to take the question of whether the government selected him for prosecution because he exercised his first amendment rights past the frivolous stage. He raised a reasonable doubt concerning the government's motive. He thus met the standard required to justify an evidentiary hearing on selective prosecution as set forth in *Catlett*.

A review of the evidence concerning the government's selection process shows that Eklund met his burden for a preliminary evidentiary hearing:

First, he offered to prove an impermissible motive through memoranda indicating that Justice Department officials knew the effect of the passive enforcement system would be to prosecute persons "who object on religious and moral grounds and persons who publicly refuse to register." In one official's words, "the chances that a quiet non-registrant will be prosecuted is [sic] probably about the same as the chances that he will be struck by lightning." *See United States v. Wayte*, 549 F.Supp. 1376, 1384 (C.D.Cal.1982), *reversed*, 710 F.2d 1385 (9th Cir.1983).

Second, he offered to prove that the government had an adequate opportunity to develop reasonable, alternative methods of enforcement. President Carter reinstated draft registration in July, 1980, and no one was indicted for non-registration until the summer of 1982. Thus, even excluding President Reagan's grace period from January 7, 1982 through February 28, 1982, the government had two years to develop a fair random selection system before it requested any indictments. The reasons offered by the government to excuse its delay in implementing an active selection system are inadequate. While the Selective Service System did not have statutory authority to use social security data until

December, 1981, state drivers license records have apparently been available during the entire period in question, and Selective Service did not need statutory authority to use these records. Failure to use them earlier is not explained in this record. Further, the government's argument that the existence of some obsolete addresses in the social security list renders the entire list useless is not supported by the record. Developing a fair and random system does not require finding addresses for all 674,000 non-registrants. The social security numbers, names and birthdates (which can never be obsolete) could be matched against the draft registration list, and yield a far greater pool of non-registrant names than resulted from the passive system. Address problems could be dealt with after a valid sampling from this pool.

Third, the record suggests that the passive system was itself implemented in a discriminatory manner.[1] Selective Service had the names of 134 non-registrants as of June, 1981. These individuals had either reported themselves or were reported by third persons. Selective Service sent warning letters to 103 of these non-registrants; the 31 others had "inadequate addresses." Of the 103 cases:

—16 responded by writing that they were refusing to register;

—45 did not reply;

—37 warning letters were returned undelivered; and

—5 had unknown delivery status.

Selective Service forwarded the files on all 134 of these cases to the Justice Department (which sent them to the respective United States Attorneys' offices). As of September, 1982, only 13 non-registrants had been indicted. The United States conceded in *United States v. Schmucker*, 721 F.2d 1046, 1049 (6th Cir.1983), that these 13 men had written letters refusing to register.[2] It also appears that the government did not prosecute or otherwise pursue the

---

**1.** This evidence is found in the record of *United States v. Martin*, 733 F.2d 1309 (8 Cir.1984) which was also before us in this appeal.

**2.** Our record contains an affidavit stating that each of the first eight non-registrants indicted had written the government refusing to register, and had publicly protested draft registration.

cases of the 45 men who did not reply to the warning letters, or the 37 men whose warning letters were returned undelivered. These men were known non-registrants. Apparently the moral of the government's policy is: if you want to evade the draft registration law, do nothing, say nothing, and you will not be prosecuted. Only those with the courage and candor to write the government refusing to register will be punished. This fact alone is enough to shed reasonable doubt on the government's motives.

The majority contends that government awareness of a discriminatory impact differs from a discriminatory *motive*, and that ultimately the government's enforcement system did not impinge upon the defendant's first amendment rights. I respectfully disagree. The evidence of the government's knowledge of a discriminatory *impact* certainly casts a reasonable doubt on its selection *motive*, which under *Catlett* is sufficient to justify an evidentiary hearing. Moreover, knowledge of this impact is even more suggestive of an impermissible motive when coupled with evidence of the government's awareness of a reasonable, alternative enforcement method.

The majority concludes that enforcement measures against non-registrants were based on their noncompliance with the law, not on the government's view that the defendant's ideas on registration were unacceptable. The fact is, however, that the government did not proceed against non-registrants generally, but focused on those who communicated their refusal to register to the government. The defendants' communicated refusal and their consequent prosecution are too closely interconnected. In *United States v. Schmucker, supra,* 721 F.2d at 1049, the Sixth Circuit explains why the passive enforcement system impinges upon first amendment rights:

It selects for prosecution only those who speak out against the law. It selects people based on their expression of beliefs and the strength of their convictions. It excludes, and therefore rewards, thousands who engage in covert noncompliance and evasion of the law, including all those who would confess their violation if sought out and interviewed. It discourages dissenters from expressing their criticisms of government policy.

The circuits are divided on the selective prosecution issue raised in this appeal. The Ninth Circuit agrees with the majority, *United States v. Wayte,* 710 F.2d 385 (9th Cir.1983).[3] Our position finds support in the Sixth Circuit decision of *United States v. Schmucker, supra,* and in *United States v. Falk,* 479 F.2d 616 (7th Cir.1973) (sufficient showing made that prosecution for draft card violation was based on defendant's status as vocal Vietnam war draft protestor; remanded for evidentiary hearing).·

I thus conclude that Eklund met his burden of making a non-frivolous showing of selective prosecution, entitling him to further discovery and a full evidentiary hearing on the question. He should be permitted an opportunity to discover and offer further evidence, and to question appropriate government officials concerning:

—memoranda or statements with respect to the expected effect of the passive selection method;

—the decisions affecting implementation of an active selection system which would have included inadvertent and intentional, but quiet non-registrants;

—detailed information with respect to each of the 134 non-registrants.

Because the majority opinion does not afford defendant this evidentiary hearing, I must dissent.

---

**3.** This dissent is consistent with the dissent in *Wayte.* We would add that *Wayte* appears to be inconsistent with *United States v. Steele,* 461 F.2d 1148 (9th Cir.1972).